FREDERICK S. DALE'S APPEAL FROM PROBATE.

New Haven Co., June T., 1888. PARK, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, JS.

On an appeal from the probate of a will on the ground of the incapacity of the testatrix and of undue influence used upon her, the appellees being three legatees who were her sons, it was held that a declaration of one of the appellees against the capacity of the testatrix was not admissible against the others, and as all were parties in the same suit, in which the verdict would affect all, could not be admitted at all.

The three appellees, with a sister since deceased, had signed an agreement three years before the will was made, with regard to the care of her property, in which they stated the fact of their mother's great age and incapacity to manage her property. This document having been laid in as evidence by the appellant, the judge charged the jury that it was to be regarded as merely the expression of the opinion of the signers at the time, and was to be considered in connection with and as affected by all the evidence in the case with regard to the mental capacity of the testatrix. Held to be correct.

One of the appellees testified as a witness in support of the will, and was
asked on cross-examination if he did not testify in the probate court
that the testatrix was not competent to make a will. The appellees
objected to the inquiry, but said they made no objection to a statement
by the witness of all he said in the probate court, which the appellant
declined to accept, and the court excluded the question. Held that,
as it was the right of the witness to answer the question by repeating
all that he said in the probate court, and as the appellant would not
receive that answer, the appellant could not complain of the ruling of
the court excluding the question.

One of the appellees had some time before expressed an opinion that the
testatrix was not of capacity to make a will. Held that he was pro-
perly allowed to explain his change of opinion as the result of informa-
tion with regard to what in law constitutes testamentary capacity.

Where the question is one of sanity or testamentary capacity at a given
time, the law permits the evidence to cover a long space of time in
either direction. It of course weakens as the time lengthens and at
last ceases to be of any force. It is for the jury to determine this under
proper instructions from the court.

Where a legatee who has taken part in the procuring of a will which prefers
him before the natural objects of the testator's bounty, stands in a rela-
tion of special confidence to the testator, as physician or lawyer or
spiritual adviser or the like, the law requires him at the outset to
assume the burden of proving that his influence did not overcome the
free agency of the testator.

But where a mother lived with her son and in an intimate and confidential
relation, and several years before her death made her will giving her
property nearly equally to her three sons, excluding the children of a
deceased daughter for the assigned reason that previous provision had
been made for them, it was held that the burden was not imposed upon
the son, of proving at the outset that he did not unduly influence the
testatrix. The contestant would however have the benefit of the infer-
ence to be drawn from the opportunities enjoyed by the son for coercion
or persuasion.

For the purpose of invalidating the will evidence was given of what the
testatrix had said. Held that the court was not improperly exercising
its power in reminding the jury "that witnesses who undertook to
repeat what the testatrix had said to them on various occasions might
not have understood her correctly or remembered all that she said; and
that she might have failed to express with accuracy the thought in her
mind."

A witness read from a memorandum made by her and was asked on cross-
examination what she meant by a certain expression. Held that she
had the same right to explain what she meant by it as she would have
had if she had used the same expression in her oral testimony.

Where the court assigns an insufficient reason for admitting evidence to
which there is no valid objection except that it should come in in a dif-
ferent order, a new trial will not be granted unless it appears that there
had been an improper use or application of it.

Where evidence of a certain fact is erroneously excluded, and later in the trial the fact is admitted by the other party, the error is healed.

[Argued June 12th—decided November 13th, 1888.]

APPEAL from a probate decree approving and allowing the will of Mary Ann Monson, deceased; brought to the Superior Court in New Haven County, and tried to the jury before *Fenn, J.* Verdict for the appellees and appeal by the original appellant. The case is fully stated in the opinion.

*C. R. Ingersoll* and *S. E. Baldwin*, with whom was *E. A. Smith*, for the appellant.

*H. Stoddard* and *J. W. Alling*, for the appellees.

PARDEE, J. Mary Ann Monson died on April 28th, 1887, resident in the probate district of New Haven, leaving a will dated May 21st, 1880. The executor asked the probate court to admit the will to probate upon proof of due execution. On July 8th, 1887, the probate court, upon hearing, found that the instrument presented was duly executed by the testatrix as and for her last will and testament when she was of sound mind and memory; and approved and allowed the same and ordered it to be recorded.

On August 6th, 1887, Frederick S. Dale appealed from this order to the Superior Court. He contested the probate of the will for two reasons: 1st, because of the alleged want of testamentary capacity on the part of the testatrix, resulting from the asserted immoderate use of intoxicating liquors; 2d, upon the alleged fact of undue influence exerted by her son, Frank A. Monson.

The appellant requested the court to charge the jury as follows :—

1. The issue for you to decide is, whether the paper offered in evidence as the last will of Mary Ann Monson was executed by her, according to the formalities prescribed by law, and freely, and while she was of sound mind and sufficient capacity. If you find all these conditions to have been ful-

filled, your verdict should be for the appellees, that is, in favor of the probate of the paper as a valid will. But if you find any one of these conditions not to have been fulfilled, your verdict should be for the appellant, that is, against admitting the paper to probate.

2. The burden of proving each and all of these conditions to exist rests by law on the appellees.

3. Every fact which tends to show that this will is not a valid one, whether it relates to Mrs. Monson's age, or capacity, or to fraud or undue influence exerted upon her by any person or persons to procure the making of this will, is material for you to consider in determining upon your verdict.

4. In order to support the will, the appellees must satisfy you by a preponderance of evidence that Mrs. Monson was of sound and disposing mind and memory on May 21st, 1880; and in particular that she then knew substantially what property she owned and meant to dispose of, and the manner in which, and persons to whom, she meant to distribute it. And you must be also satisfied that she was not induced to execute the will by the influence of any person unduly exerted upon her.

5. In ordinary cases, if the attesting witnesses to a will all agree in the opinion that the will was duly made and executed, it throws the burden of proving affirmatively the exercise of undue influence or want of testamentary capacity on the heirs who may contest the will. But this is not always so where a confidential relation is shown to exist between the testator and a legatee under the will.

6. In this case the appellant has shown, and the appellees admit, that for several years before the date of the alleged will, Mrs. Monson had a large property in her own right, yielding an income of several thousand dollars, which was collected and mainly expended for her by her son Frank A. Monson, and that she seldom had more than a few dollars at a time in her own possession, all of which was given her by him. If you find that there was, as the appellant claims, a confidential business relation between her and Frank A. Monson subsisting at the date of the alleged will and for

several years next previous, by which he was her general agent to manage her property, income and expenditures, paying and regulating her ordinary household expenses, and paying among other things the lawyer who drew this alleged will, and that she herself knew little about the nature or condition of her property or the amount of her income except as she got it from him, and that he alone of all the heirs knew of the execution of the will at the time, and took her to the lawyer who drew it, then a legal inference arises, as matter of law, against the validity of the will, which is not overcome by the mere testimony of the subscribing witnesses, but throws on the appellees the burden of showing by a clear preponderance of evidence that everything connected with the making and execution of the alleged will was free from impropriety and unfairness; and requires you to make a careful examination of the conduct of Frank A. Monson, and makes it necessary that you should be satisfied that those relations existing between them, above referred to, had no undue or improper influence over Mrs. Monson's mind, and did not induce her to make a different disposition of her property or any part of it from what she would otherwise have done; and unless you are satisfied from the evidence that his conduct in this matter was unexceptionable and proper, and that he in fact exerted no improper influence over her mind, and that the disposition of her estate was not changed by his relations with or influence over her, your verdict should be for the appellant, that is, against the alleged will.

7. Undue influence is not ordinarily susceptible of direct proof, and the jury therefore have a right to infer it from the nature of the transaction alone, the relations of the parties, the terms of the alleged will itself, and all the circumstances attending the making of it.

8. The exercise of undue influence does not necessarily mean coercion by force, or threats, or fear or apprehension; but such influence may include flattery, or promises of benefit, or any art employed for the purpose of accomplishing the improper object.

It was found that the facts referred to as admitted in the first paragraph of the sixth request were not in terms admitted by the appellees and would not have been conceded as therein alleged, though it appeared in evidence and was not substantially contested that Mrs. Monson, for several years before the date of the will, had property in her own right, yielding an annual income of some thousands of dollars, which was mainly, but not entirely, collected by Frank A. Monson; that while she incurred such bills as she desired she seldom had much money by her, and kept no bank account, but called on him for such money as she wished, asking, generally, for small sums of a few dollars only, and that he gave her what she asked.

The court did not charge as above requested, except as hereinafter set forth, but charged the jury as follows:—

" Gentlemen of the jury:—The issue for you to decide is, whether the paper offered in evidence as the last will of Mary Ann Monson, is a legal and valid will. Upon the trial of this issue it is incumbent upon the party seeking to sustain the will, the appellees in this case, to show that it is so by a fair preponderance of evidence. The burden of proof is upon them in the first instance to prove the formal execution of the will, and also that the testatrix at the time of its execution possessed that degree of intellect which is denominated in law sound and disposing mind and memory, or testamentary capacity. Having introduced the subscribing witnesses to this point, by the practice in this state the appellees rest, the appellants go forward with their evidence, and the appellees then rebut. The formalities required in the making of a will as provided by the statute in force at the time the paper in issue purports to have been made, in 1880, are that wills should be in writing subscribed by the testator, and attested by three witnesses, all of them subscribing in his presence and in the presence of each other. These formalities have been testified to and are not disputed. The contention on the part of the appellant relates to the mental capacity of the testatrix, and also is that the paper offered for probate was procured by the exercise

of undue influence upon her. Although the evidence by which the want of capacity is sought to be shown, and with regard to undue influence, and the claims made, bear in some parts an intimate relation and are interwoven, it is important for clearness to distinguish them and examine them separately, because they are in fact distinct issues subordinate to the main issue of the validity of the will, and because, while the burden of proof in the first instance is upon those insisting upon the probate of the will to prove the capacity of the testatrix, the burden of proof on the other hand to show undue influence is ordinarily upon those who oppose the will. * * * What constitutes undue or improper influence which would defeat the probate of the will is again a question of law, and upon this point I instruct you that the degree of influence necessary to be exerted over the mind of the testatrix to render it improper, must from some cause or by some means be such as to induce her to act contrary to her wishes, to make a different will and disposition of her property from what she would have done if left entirely to her own discretion and judgment; that her free agency and independence must be overcome, and that she must by some domination or control exercised over her mind have been constrained to do what was against her will, and what she was unable to refuse and too weak to resist. A moderate and reasonable solicitation, entreaty and persuasion, though yielded to, if done intelligently, without constraint, and from a sense of duty, would not vitiate a will in other respects valid. If a paper is executed with the requisite formalities of a will and the person signing it is shown to have sufficient capacity to make a will, the presumption is that it was executed fairly, and without fraud or mistake, until the contrary appears, and the burden of proof is therefore upon the party alleging undue influence. That burden may, however, be satisfied, shifted or discharged whenever the business relation existing between the testator and the persons specially benefited by a will, and having drawn the will or having been shown to have had part in the procuring it to be drawn, is such as denotes special confidence, and

gives to the party so benefited a controlling influence over the testator. In such cases the jury should be fully satisfied that the relation had no undue or improper influence over the mind of the testator and did not induce a different disposition from what would have otherwise been made. The existence and exercise of undue influence is not often susceptible of direct and positive proof. It is shown by all the facts and circumstances in the case, by the facts and circumstances surrounding the testatrix, the family relations, the will, her condition of mind, and of body as affecting her mind, her condition of health, her dependence upon and subjection to the control of the person claimed to have influenced her, and the opportunity of such person to wield such an influence. Such an undue influence may be inferred as a fact from all these facts and circumstances, and others of a like nature that may be in evidence in the case, even if there be no direct or positive evidence of the existence and exercise of such an influence; but the facts and circumstances ought to be such as to lead justly and reasonably to such an inference, and such an inference is not to be drawn unfairly or unreasonably."

The verdict was for the appellees. The court accepted it, and rendered judgment in affirmance of the order and decree of the probate court approving the will. The appellant appealed from the judgment of the Superior Court to this court, for reasons as follows :—

1. Because the question to Mrs. Stella Monson was allowed and answer received, on her cross-examination, touching collusion between her husband and others.

2. Because the question to her was allowed and answer admitted, as to what she meant by the phrase "share and share alike," in her memorandum.

3. Because of the exclusion of the question to F. S. Dale as to what part C. C. Monson took in the probate court trial.

4. Because of the exclusion of F. S. Dale's testimony as to what opinion C. C. Monson, one of the appellees, gave on the stand, in the probate trial, as to his mother's testamentary capacity.

5. Because of the exclusion of the question to C. C. Monson, as to his testimony on this point.

6. Because of the admission of C. C. Monson's testimony on cross-examination, touching his being informed by Mr. Beach what testamentary capacity was before he sent the telegram.

7. Because of the admission of his testimony touching Dr. A. P. Monson's indorsements for Charles Monson.

8. Because of the exclusion of the question put to Wm. E. Ford.

9. Because of the admission of all and every part of Dr. Russell's testimony as to Mrs. Monson's mental capacity and competency in 1887.

10. Because the several instructions to the jury, requested by the appellant, were not given.

11. Because the court did not specifically instruct the jury as to the presumption of undue influence that arose from Frank A. Monson's business and confidential relations with his mother, and that the burden was on the proponents of the will to show that he exerted no such influence.

12. Because the court instructed the jury that Mrs. Monson had a right to determine how to distribute her property among or withhold it from the natural objects of her bounty, and again, that she had a perfect right to dispose of her property by will in any way she saw fit; thus taking away from them the question whether she had in fact the necessary capacity so to determine.

13. Because the court erred in its charge as to what was required to make influence undue.

14. Because the court instructed the jury that to shift the burden of proof as to the validity of the will by undue influence, it must have been exerted by all the persons specially benefited under the will.

15. Because the court erred in charging the jury as to the testimony of the witnesses to casual conversations with the testatrix, and in saying to them that she may not have used language indicating her meaning, or the witnesses may not

have heard it exactly, or their knowledge of her family affairs may have affected their recollection.

16. Because the jury were told that the expression of the opinion of Frank A. and Charles C. Monson, in the paper signed in January, 1887, as to their mother's capacity, was to be considered in connection with and as affected by all the evidence in the cause touching that subject.

17. Because the court told the jury that they could not consider the signatures of Mr. or Mrs. T. N. Dale to that paper, as any evidence of their statement of a claim, in 1877, that Mrs. Monson was incompetent to manage her affairs.

Taking these in their order. Mrs. Stella Monson is the wife of Charles C. Monson, a son of the testatrix and a legatee under the will. Upon the trial before the probate court these persons were called as witnessess by the appellant; also upon the trial in the Superior Court. Upon the cross-examination of Mrs. Monson in the latter court, the appellees asked the following question:—"Whether at any time there was any talk or collusion of any kind between you and your husband upon one side and Frank upon the other in reference to an attempt to influence your mother in any way to make a will?" This was objected to as not being germane to the direct examination. The court admitted it.

The argument of the appellant is, that he had claimed the existence of undue influence on the part of Charles C. Monson, the husband, and Frank; but had not claimed any upon the part of the wife; that he had not claimed collusion of any sort between herself and husband on one side and Frank on the other.

The record discloses the fact that after the appellant had placed Mrs. Monson upon the stand, he interrupted her direct examination for the purpose of examining Mrs. Alfred P. Monson, who testified, among other things, that she called at the house of the testatrix; that she saw Charles in the sitting-room, sitting with his back to the window; that she inquired for his mother and he said, "Do you want to see her?" that she said "I do," and stated a reason; that he did not consent very mannerly, but finally let her go; add-

ing, "the watch dog evidently did not want any conversa-
tion between the Dr. (Alfred) and myself and his mother."
The finding then adds, "It was claimed by the appellant's
counsel at this stage of the case that actual collusion existed
between Charles C. and his wife Stella, and Frank A., in
reference to making a will."

The court in permitting the question remarked: "In the
examination of this witness, whatever her interest is, I can-
not discover any bias or any showing that she is an unwilling
witness. I am rather inclined to think it is fair in view of
all the circumstances."

We are permitted to presume that one of the controlling
circumstances referred to was the fact that the appellees
would be entitled to the answer whenever they should choose
to call the witness, and therefore it became merely a matter
of the order of testimony. Moreover if the court assigns
an unsatisfactory reason for admitting testimony to which
there can be no objection other than that it should come
in another order, we should not grant a new trial unless
it should be made to appear that there had been improper
use or application of it.

The appellant asked Mrs. Monson to read to the jury the
following extract from her diary :—" May 18th, 1880. I be-
gin from this time on to write my suspicions of my brother
Frank, which I hope may prove in the ordinary course of
time untrue and unfounded. As it is I write this, and it is
my intent hereafter to make note of things significant, in
case they should be brought up afterwards, which I hope
and pray they may not be. I am suspicious he is trying to
get her to make her will, which I don't think she would if
uninfluenced, and if she did, she would be just to all, giving
share and share alike."

Upon cross-examination counsel for the appellees asked
her this question :—" And when you state in this memoran-
dum 'share and share alike,' I want to know whether you
included in the share and share alike, Sarah's children?"
(Sarah was a daughter of the testatrix, recently dying, leav-

ing children.)   The witness answered, "I don't think it was in my mind at all."

This memorandum is not a contract; is not a writing under which any person has or can claim any right; is not entitled to immunity from parol explanation or contradiction. If the witness had said orally upon the stand that she thought the testatrix would have divided her property among her heirs "share and share alike," it would have been her right to explain to the jury her meaning in using the words, and the right of the appellees to ask for an explanation.   It is a question of intent, and she is a competent witness upon that point.   The memorandum is to stand upon the same footing with such oral declaration. · There were living children of the testatrix ; one had died leaving children; it was especially proper that the witness should have opportunity to state to the jury the precise mode of division which she believed the testatrix would adopt.   The appellant asked the witness to use the words referred to ; he desired the jury to know there from her belief as to what the testatrix would do.   The cross-examination tended to make it quite certain what that belief really was.   He cannot complain of this.

Upon the trial in the Superior Court, before Charles C. Monson had testified, the appellant testified that Charles C. Monson took part in the preparation and trial of the case in the probate court.   He was asked to state what part Charles C. Monson there took and on what side.   The appellees objected to this question and it was excluded ; the appellant excepting and claiming that an answer would show that Charles C. Monson there took an active part in opposition to the probate of the will.

Subsequently the appellant called Charles C. Monson and asked him if he opposed the will in the probate court.   He answered that he did.   Inasmuch as he admitted that to be true concerning himself, which the appellant desired to prove by his own testimony, and as it does not appear that the fact was at any time disputed by the appellees, it would seem that the exclusion of an answer by the appellant had not worked any injury to him.

The appellant put to Charles C. Monson this question:—" Did you testify in the probate court that in your judgment, founded on your knowledge of your mother's circumstances and condition, she was not competent to make a will on May 21st, 1880?" The appellees objected to this question on the ground that the appellant was not entitled to cross-examine his own witness, and added that they made no objection to a statement by the witness of all that he had said in the probate court upon that subject. The appellant declined to ask the question in that form; the question as asked being excluded, he took exception.

It would have been the right of the witness to answer the question asked by the appellant by repeating all that he had said in the probate court upon that point; to re-state to the jury what he had there said, that the jury might determine what opinion he had there expressed. The appellant could not have excluded this from his answer. Inasmuch therefore as the appellant was tendered an answer in the only form in which he could have enforced it and refused acceptance, we cannot say that the court injured him by its ruling.

The appellant testified in the Superior Court that Charles C. Monson expressed as a witness under oath before the probate court, his opinion as to the testamentary capacity of the testatrix at the time of making the will in question. He was then asked what opinion Charles C. Monson there expressed? Upon objection by the appellees he was not permitted to answer.

The three sons of the testatrix, Alfred P., Charles C., and Frank A. Monson, are her legatees and the appellees in this proceeding. The claims of the appellant as to want of testamentary capacity, and as to undue influence, are against the will as a whole, and of course against every legacy therein given. Although as a matter of form there is but one proceeding in court, and the appellant is of record the party on one side, and the appellees the real party on the other, yet in no sense are these last jointly interested in the same legacy. After some specific legacies the will proceeds thus:—" All the rest and residue of my estate and

property, real and personal and mixed, whatsoever and wheresoever, I give, devise and bequeath to my three sons, Alfred Monson, Charles C. Monson, and Frank A. Monson, to have and to hold the same to them, their heirs and assigns, in fee simple and forever, in equal shares." Even' if the residue should be distributed before conversion into money, each is to become the absolute owner of one third part in value in severalty. If our mode of procedure in the settlement of the estates of deceased persons had permitted the appellant to take three appeals, one as against each legatee, and try each alone, or had permitted each legatee to have a separate trial of the issue raised by the appellant, then, upon the trial of Charles C. Monson's appeal, it would have been quite permissible to the appellant to prove that, although Charles C. Monson was claiming in the Superior Court his rights under the will as legatee, he yet had insisted before the probate court that his mother was without capacity to make a will. In such case his contradictory declarations would have affected the only person whom he represented, or for whom he was authorized to speak, namely, himself. But inasmuch as the law has compelled Alfred and Frank A. Monson to submit their several and individual rights of property in this estate to the issue of a proceeding which also determines those of Charles C. Monson, it, in avoidance of great injustice, has suspended in their favor the operation of the rule that a party to a proceeding may prove the admissions of his adversary. Of necessity, the use of Charles C. Monson's admission against him would be to use it against all other legatees; and the appellant may not enforce his right against Charles C. Monson at the expense of Alfred and Frank A. Monson. If there be a misfortune in the situation it must be upon the appellant.

A person may be made the legatee of an inconsiderable portion of a large estate. It is contrary to legal reason that an expression of his opinion as to the capacity of the testator, not made under oath, there being no cross-examination as to opportunities for knowing, as to reasons for believing,

or as to motives for speaking, should affect valuable rights of others, holden separately from himself, especially as he has not been called by them to express an opinion under oath upon the matter.

It is true there are decisions to the contrary; but we think the weight of authority is with the opinion here expressed. *Phelps* v. *Hartwell*, 1 Mass., 71; *Nussear* v. *Arnold*, 13 Serg. & Rawle, 323; *Clark* v. *Morrison*, 25 Penn. St., 453; *Irwin* v. *West*, \*81 Penn. St., 157; *Thompson* v. *Thompson*, 13 Ohio St., 356; *Rogers* v. *Rogers*, 2 B. Monroe, 324; *Shailer* v. *Bumstead*, 99 Mass., 112; *McMillan* v. *McDill*, 110 Ill., 47; *Hayes* v. *Burkam*, 67 Ind., 359; *Forney* v. *Ferrell*, 4 W. Va., 729; *La Bau* v. *Vanderbilt*, 3 Redfield, (N. Y.,) 384.

In *Saunders's Appeal from Probate*, 54 Conn., 108, the appellant, one of several legatees, claimed that two other legatees had exercised undue influence over a testatrix, whose mind had been weakened by disease. Before either of the two last named had testified, he was allowed to prove that one of them had declared that himself and the other legatee "had got the will fixed as they wanted it." Subsequently the appellees called the declarant, and he testified that he had never exercised any influence over the testatrix. So that the case stood at the last as one of contradiction of his testimony as to a fact for the purpose of lessening his credibility. This conclusion is the answer to the fifth reason of appeal, and an additional one to the third and fourth reasons; for the real purpose of the question referred to in the last two reasons was to put the jury in possession of the fact that Charles C. Monson at a previous trial held the opinion that his mother was without testamentary capacity; otherwise the question is pointless.

The appellant, for the purpose of weakening the position of Charles C. Monson in the Superior Court, caused him to admit that on the trial before the probate court he had opposed the probate of the will. Charles C. Monson, for the purpose of protecting himself in some degree from the effect of his forced admission, testified, notwithstanding the appel-

lant's objection, that his change of attitude towards the will was the result of new light thrown by counsel upon the question as to what in law constituted testamentary capacity. He did not repeat what counsel had said, but only stated the effect upon his own mind.

We think it was his privilege to state to the jury the reason why he now supported, when under other circumstances he had opposed the will.

Charles C. Monson, called by the appellant, testified that he and his brother Frank so arranged as that one of them should always be in the house with their mother whenever their uncle Charles was there; that uncle Charles had procured one indorsement from her without their knowledge, and that they did not intend that he should get any more. Upon cross-examination the appellees, for the purpose of refreshing the memory of the witness as to the time of the arrangement between himself and his brother Frank, and for the purpose of proving that it was made ten years anterior to the time of making the will, and in the lifetime of the husband of the testatrix, asked the witness if he did not know that his uncle Charles had procured indorsements from his father, and to the great loss of the latter? The appellant objected; the court permitted it.

This was quite within the privilege of a cross-examination; a legitimate endeavor to lead a witness from a supposed error, back to the truth, using facts as way-marks.

The appellant called William E. Ford, clerk in the drug store of Mr. Olmsted from 1865 to 1882, and asked him what orders he had received as to selling or not selling certain antidotes to the testatrix. The appellant proposed to follow this by evidence that the witness had been instructed not to sell alcohol to her; and that this instruction was not given either by the appellant nor by Alfred P. Monson.

Of course the exclusion of these two persons failed to make it certain that either of the appellees had given the instruction.

Moreover, Mr. Olmsted being called as a witness subsequently by the appellees, in answer to the appellant testi-

fied that upon the request of Mrs. Dale, her daughter, he instructed the clerk not to sell alcohol to the testatrix. . We think the appellant is without cause of complaint as to this matter.

The appellees introduced Dr. T. H. Russell, who testified that he had no acquaintance with Mrs. Monson until the last week of her life, when he was her attending physician and attended her sixteen times; he testified as to his knowledge of her condition at that time, and he was then asked what her mental condition then was. The appellant objected, on the ground that the time was too remote from that of the making of the will, but the court admitted it, the appellant excepting, and the reply was that he noticed no sign of mental impairment. He was then asked if in his judgment she would have been then competent to do anything she wanted to in the way of her business affairs, and replied in the affirmative, after similar objection, ruling and exception.

When the question is one of sanity or testamentary capacity at a given time, upon the presumption that the mind does not ordinarily pass suddenly and sharply from sanity or capacity into the opposite condition, nor from the latter into sanity or capacity, but gradually and imperceptibly as day into night, the law permits the evidence to cover long spaces of time in either direction. Of course it weakens as time lengthens and in either direction at last ceases to be of any force. All this however is for the jury to determine under proper instructions from the court.

As to the tenth and eleventh reasons. Upon the question as to undue influence the charge meets the requirements of the law. The real point of the appellant's complaint is, that the court did not recite in detail the evidence introduced by him as to the business relation borne by Frank A. Monson to his mother, and instruct the jury, not that possibly, as a matter of reasoning, but certainly, as a matter of law, it proved undue influence. In certain cases, where the natural objects of the testator's bounty are excluded from participation in his estate, where strangers supplant children,

and the will is in favor of his attending physician, or of the lawyer drawing and advising as to its provisions, or of the guardian having charge of his person and estate, or of his spiritual adviser attending him *in extremis*, the law requires the legatee at the outset to assume the burden of proving that his influence did not overcome the free agency and independence of the testator; that he did not exercise such domination or control over his mind as to constrain him to do what was against his will. In the present case nearly seven years intervened between the execution of the will and the death of the testatrix; her living children are three sons, and are the recipients of her entire estate in satisfactory proportions; the children of her deceased daughter are excluded for the assigned reason that previous provision had been made for them; and assuming that the relation between one of these sons and his mother was intimate and confidential to the degree expressed in the appellant's request to charge, he is not thereby placed under such ban of legal suspicion as that it is necessary for him at the outset to take the burden of proving that he did not unduly influence her in the matter of her will. It is the duty of a son to entitle himself to the confidence of his parents; it is his right to ask with earnestness, restrained within proper limits, for testamentary remembrance; it is the privilege of the parent to make it, having capacity to know what is done. In this instance it is true the mother and son dwelt together as one family; of course all opportunities were open to him, but yet, as a matter of law, the burden remained with the appellant. It was for him to prove that the son abused the confidence of the mother; or that his superior mind so dominated her own, as that, unable to resist, she surrendered her judgment and will to him. This the appellant was not required to do by direct evidence; he was permitted to do it wholly upon inference; upon inferences drawn from the opportunities merely for coercion by threats or inducements by flattery.

There is no foundation in fact for the twelfth assign-

ment of error. It is based upon an erroneous interpretation of the charge.

As to the thirteenth assignment of error. The court correctly charged as to what constituted undue influence.

There is no reason for believing that the jury understood the court to instruct them, as claimed in the fourteenth request, that his two brothers must necessarily have joined with Frank A. Monson in exercising undue influence upon their mother, in order to invalidate the will.

As to the fifteenth error assigned. The court was in the proper exercise of its power in reminding jurors that witnesses who undertook to repeat what the testatrix had said to them on various occasions, might not have understood or remembered all that she said, and that she might have failed to express with accuracy the thought in her mind.

As to the sixteenth error assigned. In 1877, while the testatrix was living, her three sons, her daughter and husband, executed a writing which, among other things, contained an agreement as to the adjustment of advances to each of them, to go into effect upon the death of their mother; also this recital : " In consideration of the great age, and the inability of our mother, Mary Ann Monson of said New Haven, to manage her property and affairs, and our mutual desire to provide for her happiness during the remainder of her life, and the further consideration of our mutual advantage in securing and protecting the property and estate of Mary Ann Monson, as well as the property and estate of our late father Alfred S. Monson, deceased, we have mutually agreed," etc., etc.

Concerning this paper the court said to the jury—" The paper signed January 30th, 1877, by Thomas N. and Sarah P. Dale, and Alfred, Charles and Frank Monson, has of itself no effect upon the capacity of Mrs. Monson to make a will or upon her legal right to make a will. Mrs. Monson had a perfect right to dispose of her property by will in any. way she saw fit, even if such disposition was entirely inconsistent with the terms of the paper. It is not to be considered at all as equivalent to a judicial finding by the probate court,

that she needed a conservator, or that she was incapable of managing her affairs, nor of any other alleged fact therein recited or referred to. As Mrs. Monson was not a party to this paper, therefore in so far as it professes to be a contract or agreement between the signers thereto, its validity is in no manner affected by the question of the validity of the will. Therefore its true interpretation and legal effect as between the parties to it are not now questions in issue. Even if that paper contains a true statement of the opinion of any person who signed it as to the mental capacity of Mrs. Monson, yet it is to be regarded simply as an expression of the opinion of such person as to her condition at that time, and is to be considered in connection with, and as affected by, all the evidence in the case touching the question of her mental capacity and condition. In so far as that paper is signed by Thomas N. and Sarah P. Dale, inasmuch as they are not parties to this suit, and as their statement in that paper cannot be explained and qualified by their appearance in court as witnesses subject to examination and cross-examination, the paper cannot be considered as evidence at all of their opinion or of their statement of any fact or claim asserted by them or either of them therein. The paper may be considered as bearing upon the motives of the signers thereof who have appeared and testified in the case, and also as bearing upon the motives of Frederick S. Dale as a witness; and in so far as the jury may find from the evidence that Alfred P. Monson believes that the validity of the paper is involved in the validity of this will, and that he desires and cannot have the benefit of the provisions of that paper except by the overthrow of the will, that paper may be considered by the jury in weighing his testimony, and if it discloses a motive why he may desire to set aside the will, the jury should give that motive due weight in considering his testimony."

It is the complaint of the appellant that the court instructed the jury that the expression of the opinion of Frank A. and Charles C. Monson, in the paper, as to their mother's capacity, was to be considered in connection with and as affected

by all of the evidence in the case touching that subject. This writing was not in evidence for the purpose of establishing or enforcing any right of contract under it. It was introduced for the sole purpose of showing that, although Frank A. and Charles C. Monson were then in court claiming that their mother had testamentary capacity, yet in 1877 they had expressed a contrary opinion. Therefore the appellees had the right to claim and prove that the opinion in 1877 was the result of ignorance of facts; or that the writing was signed without due consideration; or because they thereby secured important advantages; or assign any good reason why the writing should not weigh against them in this proceeding.

As to the seventeenth assignment of error. Mr. and Mrs. Dale not being parties or witnesses, the appellant had no right to prove what either of them had said, either in writing or orally, as to the capacity of the testatrix.

There is no error in the rulings as to evidence, nor in the charge of the court. A new trial is not granted.

In this opinion the other judges concurred.