[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On March 6, 1990, Morris Fishbein (Morris) paid Union Trust Company $192,324.09 by his personal check to satisfy in full a delinquent mortgage debt owed by the defendant Dianne Fishbein (Dianne), on her home on 18 Laurelwood Drive in Wallingford. Dianne was Morris' former daughter-in-law and the mother of Morris' granddaughter Lynsey. Lynsey was issue of the marriage of Dianne and David Fishbein, Morris' son. That marriage had been terminated by a dissolution decree on June 13, 1989. Morris died intestate on May 2, 1990. The plaintiff Helen Fishbein (Helen) is the widow of Morris and also the administratrix of his decedent estate.
On June 12, 1990, this action was instituted by the plaintiffs[1] on a three-count complaint. The first count alleges: that the 1989 dissolution decree ordered David Fishbein to convey his one-half interest in 18 Laurelwood Drive to Dianne who, in turn, was ordered to be soley responsible for the first mortgage as well as a home equity line of credit to in the nature of a mortgage to Union Trust and other expenses on that property, that on March 6, 1990, Morris signed a check for $192,324.09 payable to Union Trust and that that check was drawn on the joint account of Morris and Helen, that this check was written by a Union Trust officer to pay off the equity line of credit for the benefit of Dianne. The defendant admits the foregoing allegations. She, however, in effect denies the remaining allegations of that count which are: that at the time this check was so issued, Morris "was ill and incapable of managing his own financial affiars", that at that time "and for some time prior thereto, Dianne . . . exerted undue influence, control and dominion on Morris — causing him to issue the check for her benefit" and, that as a result of this transfer ". . . the Estate of Morris Fishbein and the plaintiff Helen Fishbein has been adversely affected and diminished", that about April 27, 1990, Helen Fishbein applied to the Wallingford Probate Court for application as conservatrix for the affairs of Morris but that he died on May 21, 1990, the day set for the hearing on her appointment, that she has been appointed Administratrix on Morris' decedent estate and that the defendant has been unjustly enriched "to the detriment of the plaintiffs".
The second count, all the allegations of which the defendant denies, alleges that of all times mentioned Morris was "incapable of managing his own affairs", that for a long time prior to March 6, 1990, the defendant "demanded money" from him, that on or about March 6, 1990, the defendant, knowing that Morris "was ill and incapable of managing his own financial affairs and desirous to CT Page 1853 take advantage [of that] exerted undue influence on Morris causing him to draw [$192,324.09] check . . . from a joint account with, Helen Fishbein . . ." which was used to pay the equity credit line on the Laurelwood Road property for which she received a release of mortgage upon which she had been solely liable and as a result of this transfer of funds, "the assets of Helen Fishbein and the assets of the Estate of Morris Fishbein have been greatly diminished."
The third count, all the allegations of which the defendant denies, repeat the allegations of the second count and merely add that at the time the check was issued, Morris "was incapable of managing his own financial affairs and was incapable of making financial decisions and he acted under the delusions perpetrated by the defendant, Dianne Fishbein."
The prayers for relief ask monetary damages, the imposition of a resulting or constructive trust upon the 18 Laurelwood Drive property and such other relief as an equity may pertain.
The defendant answered the complaint as above set and, in addition, pleaded in special defense that all sums paid by Morris to Union Trust were paid by him as a gift to the defendant and Lynsey Fishbein, the defendant's daughter and Morris' granddaughter.
At the trial eleven witnesses testified and grave questions of credibility were presented. Among the witnesses were Morris' widow, his two sons, two grandchildren, Morris' brother, the defendant, Morris' physician, an employee of Morris who now still is employed in Morris' former insurance business by one of the sons who testified and two Union Trust employees one of whom handled the March 6, 1990 transaction involving the check at issue. The trial produced a mass of evidence that has all been considered, weighed and evaluated.
The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1,14, 420 A.2d 1142 (1979); McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648, 484 A.2d 940 (1984); Steinman v. Maier, 179 Conn. 574, 576, 427 A.2d 838 (1988). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (82-AB), 188 Conn. 557, 561, 452 A.2d 113 (1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg, 195 Conn. 253, 257, 487 A.2d 545 (1985); Gutowski v. New Britain, 165 Conn. 50, 56, 327 A.2d 552 (1979); Rood v. Russo, 161 Conn. 1, 3, 285 A.2d 220 (1971). Moreover, the court is not bound by the uncontradicted testimony of any witness, CT Page 1854 Bieluch v. Bieluch, 199 Conn. 550, 555, 509 A.2d 8 (1986); Acheson v. White, 195 Conn. 211, 217, 487 A.2d 197 (1985), and, in "evaluating such testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, supra 555-556.
"Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief [in it] raise it to that level." Stanton v. Grigley,177 Conn. 558, 563, A.2d (1979). The interest of any witness may also be considered on the issue of credibility. Buonanno v. Cameron,131 Conn. 513, 515, 4, A.2d 107 (1945); Nesbit v. Crosby, 74 Conn. 554,564, 51 A. 550 (1902). "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motions underlying their testimony and conduct." Dadio v. Dadio,123 Conn. 88, 93, 192 A557 (1937).
Morris Fishbein, the decedent, established an insurance agency in Wallingford in 1933 and over the years became a successful and prominent businessman. He married the plaintiff Helen in 1937 and the evidence discloses that they have three children, David Fishbein, John Jay Fishbein and Mary Ann Fishbein Dolan Consiglio. Helen has never worked during the marriage but was a homemaker. In 1946 Morris took his brother Uria into the business which they eventually owned on a fifty fifty basis. The two brothers, inter alia, sold property and casualty insurance and also lent money on mortgages and automobiles.
David Fishbein worked for the agency from sometime in 1961 until late in 1973, left for a time, returned in about May 1975 and remained there until about July 1988. David was married in 1962 to Joan Fishbein and there were three children issue of that marriage. Jeffrey Fishbein, Jacqueline Fishbein and Sara Fishbein. That marriage terminated by dissolution on October 7, 1975.[2] David's daughter Jacqueline worked at the agency from 1981 to the summer of 1988. David married the defendant Dianne Fishbein on August 7, 1976 and there was one child born during that marriage: Lynsey Fishbein, born on August 16, 1979. That marriage terminated by dissolution on June 13, 1989. David has been residing at 2 Pine Glen Terrace, Wallingford, the residence of his parents, since late February 1989.
John Fishbein worked at the agency from 1978 to 1988 when he left because of problems with Morris. He returned in about January 1989 and now owns the agency. At that time Morris gave John his (Morris') half interest in the agency and John purchased his uncle Uria's half interest. CT Page 1855
When John Fishbein became the owner of the agency in 1989 the agency needed changing both administratively and physically, records had to be updated, the business reorganized and staff adjustments were required. Problems with insurance companies which the agency represented had to be resolved. This was undertaken by John Fishbein and Morris had serious difficulty in understanding the need for such matters and serious communication problems developed almost at once over these matters between father and son. Morris was very vocal in his views, so much so that on one occasion the police were called at John's request and Morris had to leave the office premises. He was proscribed in his comings and goings from the office thereafter. When prohibited from coming into the office when he wished he would come to the office, stand or sit outside in front or in his car. Morris, however, did come into the office three of four times between January and April 1990. John allowed his brother David to use the office in connection with David's construction business. Matters between Morris, on the other hand, and John as well as David deteriorated rapidly starting in January 1989.
For years Morris worked seven days a week. He and his wife did not take vacations during their marriage. He was strong-willed, he had ruled the office with an "iron fist" and he brought his children up that way. When he spoke that was "final" and that included everyone in the office. Morris, was diagnosed as having prostate cancer in September 1986 and was hospitalized at that time. He was quite concerned and anxious about his condition — although he continued thereafter to work at the agency. He continued throughout to drive his car and continued to do so into April 1990. Morris also used a cane. Dr. Michael Kellogg, a general practitioner, was his physician from about November 1986 until his death. Dr. Kellogg saw him over the ensuing years and noted that Morris had a chronic fear of doctors and did not like hospitals. In testifying at some length about Morris' physical and mental emotion at various times, Dr. Kellogg said Morris also discussed his immediate family and his general financial plans with him. In early 1989 and thereafter Morris indicated to Dr. Kellogg that he felt that his immediate family was conspiring against him. Between September 1989 and April 1990 Morris indicated to Dr. Kellogg that he was consolidating his finances saying that he was doing so because it had to do with his estrangement from his family and he wanted his money to go elsewhere than his wife and sons. Dr. Kellogg thought that was "odd". David Fishbein was also a patient of Dr. Kellogg and of ten spoke to David about Morris. Dr. Kellogg also discussed Morris' "depression" with the family but he did not discuss the estrangement Morris referred to.
Although Morris and Helen were married for many years, she had no knowledge of his insurance business or how it did through CT Page 1856 the years. He very rarely discussed it with her. So far as she knew Morris continued to pay his bills and the family bills until his death. Helen, who is now seventy-six, received some four hundred dollars from her Social Security each month and had been giving it to Morris to put in their savings account. In late 1989 he, however, told her that he wanted to use that money toward the payment of bills. She refused and that stayed that way until he died. In early 1989 Morris asked her to sign over to him her interest in real estate on Center Street in Wallingford. She refused and that title never changed while Morris was living.[3]
Our Supreme Court has said that "`undue influence' is the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." Reynolds v. Molitor, 184 Conn. 526, 528,440 A.2d 192 (1981); Fritz v. Mazurek, 156 Conn. 555, 559,244 A.2d 368 (1964) (both involving deeds of real estate). In the context of what constitutes undue influence sufficient to invalidate a will that court said:
 "`[T]he degree of influence necessary to be exerted over the mind of the testator to render it improper, must from some cause or by some means be such as to induce him to act contrary to his wishes, and to make a different will and disposition of his estate from what he would have done if left entirely to his own discretion and judgment. That his free agency and independence must have been overcome, and that he must, by some dominion or control exercised over his mind, have been constrained to do what was against his will, and what he was unable to refuse and too weak to resist. But that moderate and reasonable solicitation, entreaty or persuasion, though yielded to, if done intelligently and from a conviction of duty, would not vitiate a will in other respects valid." St. Leger's Appeal, 34 Conn. 434, 442, 449.'"
Lee v. Horrigan, 140 Conn. 232, 237, 98 A.2d 909 (1953). This principle was reiterated and amplified to apply to a case where there was no direct evidence of undue influence but where there was a foundation for a reasonable inference that the will of the testator would not have been such as he would have made "if left entirely to his own discretion and that his free agency and independence had been overcome, so that he was constrained to do what he was unable to refuse and too weak to resist . . . [yet] the rule which disposes with the mass of direct proof of undue CT Page 1857 influence does not relieve the [plaintiff contestants] from the burden of laying a safe foundation of material facts proven, and inferences which fairly and convincingly lead to that conclusion. . . ." Id. 237-238. Thus, direct evidence, often inavailable, is not indispensable. Id. 575, see Salvatore v. Hayden, 144 Conn. 437, 440, 133 A.2d 622 (1957). It has also been held that "undue influence" is:
 "Any influence brought to bear upon a person . . . consenting to a disposal of property, which, having regard to the age and capacity of the party, the nature of the transaction, and all the circumstances of the case, appears to have been such as to preclude the exercise of free and deliberate judgment, is considered by courts of equity to be undue influence, and is a ground for setting aside the act procured by its employment." Pollock, Contracts (8th Eng. Ed.) p. 640. Preston v. Preston, 102 Conn. 96, 109, 128 A. 292." Bucchi v. Gleason, 137 Conn. 25, 30, 74 A.2d 212 (1950).
Quite relevant is the following statement of our Supreme Court on the matter of "pressure" in undue influence cases:
 "Further explanation of just what is meant by `pressure' constituting undue influence, and of the significance of circumstantial evidence in such cases, particularly apropos in the instant case, is well set forth as follows: "`Pressure of whatever character, whether acting on the fears or hopes — if so exerted as to overpower volition without convincing the judgment — is a species of constraint under which no will can be made. Importunity or threats, such as the testatrix has not the courage to resist, moral command asserted and yielded to for the sake of peace and quiet, or of escaping from distress of mind or social discomfort — these, if carried to a degree in which the free play of the testatrix's judgment, discretion, or wish, is overborne, will constitute undue influence, though no force was either used or threatened. The existence and exercise of such undue influence is not often susceptible of direct proof. It is shown by all the facts and circumstances surrounding the testatrix, the family relations, the will, her condition of mind, CT Page 1858 and of body as affecting her mind, her condition of health, her dependence upon and subjection to the control of the person influencing, and the opportunity of such person to wield such an influence. Such an undue influence may be inferred as a fact from all the facts and circumstances aforesaid, and others of like nature that are in evidence in the case, even if there be no direct and positive proof of the existence and exercise of such an influence.'" Hobbes' Appeal, 73 Conn. 462, 467, 470, 47 A. 678; Dale's Appeal, 57 Conn. 127, 134, 147, 17 A. 757. "The ultimate question is, upon the evidence could the jury reasonably have drawn the inference of undue influence?" Hills v. Hart, 88 Conn. 394, 399, 91 A. 257." Lee v. Harrigan, supra. 238-239.
It has been said that "Ordinarily, the burden of proof on the issue of undue influence rests on the one alleging it, and this is true whether the issue arises in a will contest or a proceeding in equity to set aside a conveyance [cases omitted]. In will contests we recognize that a stranger, holding toward the testator a relationship of trust and confidence, is a principal beneficiary under the will and the natural objects of the testator's bounty are excluded [cases omitted]. The burden of proof, in such a situation, is shifted, and there is imposed upon the beneficiary the obligation of disproving, by a clear preponderance of evidence, the exterior of undue influence by him. [cases omitted]. A similar rule would seem to apply in proceedings to set aside conveyances. See Preston v. Preston, 102 Conn. 96, 11, 128 A. 292
[involving real and personal property]; Sullivan v. Clear, [101 Conn. 603, 612, 127 A. 14, involving a deed to real estate]; Mooney v. Mooney [80 Conn. 446, 452, 68 A. 985. involving deed to real estate] . . . It has been stated frequently that the rule [embodying the exception should not he extended beyond the limitation placed upon its recognition, [cases omitted]." Berkowitz v. Berkowitz,147 Conn. 474, 477, A.2d (1960). Where there is a fiduciary or confidential relationship between the testator or donor and the beneficiary or donee, then "the practical effect of the principle is to change a permissible inference of fact into a necessary presumption of fact" [and] thus the burden then rests upon the beneficiary or donor to prove that her influence did not overcome the free agency and independence of the [testator or donor], that she did not exercise such a domination or control over his mind as to constrain her to do what was against her will under all the circumstances. See Pepin v. Ryan, 133 Conn. 12, 15-16, A.2d (1946). In this case the plaintiffs do not claim that the defendant occupied a fiduciary or confidential of relationship CT Page 1859 with Morris. Assuming arguendo, they did, there would be insufficient evidence upon which to predicate such a claim. See Worbey v. Sibieth, 136 Conn. 352, 259, 71 A.2d 80 (1949), See also Zack Executrix v. Guzauskas, 171 Conn. 98, 104 368 A.2d 193
(1976) relationship of parents-in-law and daughter-in-law not sufficiently analogous to other cited relationships to support conclusion that making operative the inference, referred to in Berkowitz and Pepin, putting the burden on the defendant. The burden of proving undue influence in this case is on the plaintiffs. See e.g. Berkowitz v. Berkowitz, supra, Pepin v. Ryan, supra. The issue of undue influence presents a question of fact for the trier. See Reynolds v. Molitor, supra; 559; Salvator v. Hayden, supra. 440. The plaintiffs have not sustained their burden of proof on the issue of undue influence. Before going further on the undue influence issue the court points out the defendant has filed a special defense that the March 6, 1990 transaction was intended to be and was a fully executed unconditional gift by a competent and generous man who was concerned that his granddaughter not be foreclosed out of her family home. It also merits stating that the defendant on the whole evidence demonstrated this by a clear preponderance and this includes that it was done also with the intent that it be free and clear of any claim by the Fishbein family.
The mere opportunity of exerting undue influence is not alone sufficient because there must be proof not only of undue influence but also that its operative effect was such as to cause Morris to consumate the transaction of March 6, 1990 when to do so did not express his actual desires. See Lancaster v. Bank of New York,147 Conn. 573-574, 164 A.2d 392 (1960) and cases there cited. Undue influence has the effect of defeating the actual purpose or intent of the victim by causing him to do what he would not have done if the undue influence had not been exerted on him. See Fritz v. Mazurek, supra. 560.
In determining the existence and exertion of undue influence all the relevant facts and circumstances may be considered. Among the relevant circumstances are the victim's age, the victim's health and its effect upon his mental and physical functions, his dependence upon the person alleged to have unduly influenced him, the opportunity of that person to have exerted the claimed improper influence, the relationship of the parties involved and the nature and reasonableness of the transaction involved. Reynolds v. Molitor, supra. 529; Collins v. Endmann, 122 Conn. 626,632, 191 A. 591 (1937), 25 Am.Jur.2d Duress and undue influence 7-38. What constitutes undue influence in one case will not necessarily do so in another case. Section 25 Am.Jur.2d Duress and undue influence.
We turn a more detailed examination of the victim's factual CT Page 1860 background. On March 6, 1990, Morris was seventy-eight years old and knew and had known for some time that he had a terminal sickness. Although he had been quite concerned over this, he had, for several years declined any medical intervention for what Dr. Kellogg called "depression" he had since the 1986 diagnosis of cancer. Certain of what was testified to concerning this downhill course, mentally and physically, simply cannot be accepted. For some time after learning of his sickness he persisted, apparently with the habits of a lifetime, to continue to work as he had for over thirty years, still dominating as before. Although his two sons worked with him in the agency, there does not appear to have been any ongoing bond of affection between father and sons. The office, its records, procedures, management, accommodations and the like did need changing, updating and retrenchment. There was, however, no imminent losing or closing of the business involved. In time, however, he did give his interest to John in January 1989. In any event, John, his son became the owner of the agency and took over on January 1, 1989. Significantly, Morris did not sell his half interest to John, he "gave" it to him, he "signed" it over to him. John, however, paid Uria for his one-half interest. No longer in the entrepreneurial posture he had been for so long, Morris' "adjustment" to that was not a real adjustment; the new management took strong measures. There were no close feelings between Morris and his two sons during 1989 and 1990. Morris was eventually prohibited in great measure from the office and perhaps not without some fault on his part. Certain of his behavior after January 1, 1989 including following a female office employee[4] on a number of occasions in his car, writing her long notes and attempting to speak to her was most unusual. Parenthetically, this employee had worked at the agency for ten years before he left and at the trial said she had not spoken to Morris after September 1, 1989. He also made purchases of such things as socks, tools, men's underwear in quantities much beyond his personal needs. Nevertheless he still drove his car, went shopping with his granddaughter sometimes paying for purchases by checks he wrote out and signed. He kept the checkbook, made the bank deposits, paid bills until April 1990. There was no credible evidence at all to show that any immediate family member or anyone took any steps to stop any of his activities in the realm of managing his affairs or curtailing his comings or goings other than proscribing his access to the office, until after his hospitalization in April 1990. It was the discovery in late April or early May 1990 by his son John of the cancelled check to the Union Trust for the defendant's equity line of credit that resulted in the probate application for conservatorship.
When David became divorced from Dianne, joint custody of Lynsey was awarded, but the decree ordered that the physical residence of Lynsey was to be with Dianne. David had visitation rights with Lynsey on weekends. The defendant on Saturdays would CT Page 1861 drive Lynsey to see David who lived with Morris and Helen. The defendant would not go into their house when she dropped Lynsey off but on occasions she would see Morris from a distance. The evidence disclosed also that over the entire time she had been married to David the defendant was not close to Morris. There was no credible evidence, however that Dianne and Morris had any falling out or disputes during the marriage. It was characterized as a hello and goodbye situation with very little — no real communication. Morris had never given Dianne any gifts. Nor had he given Lynsey any gifts except for some silver half dollars. Morris, however, would take Lynsey shopping when she visited, they would have ice cream and watch television at his house and Morris would drive Lynsey home to the defendant's house.
On February 4, 1990, Morris dropped Lynsey at home after visitation as he often did. She rang the doorbell as she needed help with some packages from shopping with Morris. When Dianne came to the door Morris asked Dianne why there was a "For Sale" sign in front of the house. She was shocked that he did not know that as she believed all the Fishbeins knew why. She broke into tears, but did not answer him.
At this point fully to understand the events backing up to this "Fore Sale" sign incident insofar as they impact on the March 6, 1990 check to Union Trust additional background is now set out. The dissolution judgment of June 13, 1989 whereby the defendant was awarded David's interest in their Laurelwood Drive home also made her solely liable for, the first mortgage as well as for the Union Trust equity line of credit on those premises was not the first dissolution action that she had instituted against him. She had started another such action in December 1985 which she later withdrew in September 1986. Thereafter, in May 1987, having reconciled and at David's request, she executed with him a "Home Equity Line of Credit Agreement" secured by a "Home Equity Line of Credit Open — 2nd Mortgage" in the amount of about $175,000.00 to Union Trust on their home on Laurelwood Drive. David took the proceeds of this loan to develop some property in Madison. Thereafter, the parties again had marital difficulties and the loan became delinquent. In September 1989 the defendant and her accountant visited John Chamberlain at the Union Trust's Wallingford Office with reference to working out the delinquency on the home equity loan which was then between six and eight months in arrears. On December 6, 1989, the bank sent its counsel a written authorization to foreclose this mortgage and on December 20, 1989, it wrote the defendant that a freeze had been placed on the account. On February 22, 1990, the bank wrote the defendant and informed her that as to the mortgage there was a nine month delinquency in the amount of $22,265.70. That letter clearly indicated, in its terms that she was to pay that amount within thirty days and that "your failure to do so may result in CT Page 1862 acceleration of the sums secured by this mortgage and foreclosure or sale of the property."[5]
Sometime very late in February 1990, Morris came to see John Chamberlain at the Union Trust office in order to get information from him concerning that bank's home equity loan on the defendant's Laurelwood Drive property. When Morris came in at that time Chamberlain did not know him although he had heard of him and knew he was a "prominent businessman" in Wallingford. Chamberlain told him that he could not discuss the matter with him. Later Chamberlain, having obtained the defendant's permission to give Morris the information he wanted, did so, Morris thanked him, did not tell him why he wanted the information and he left.
On Saturday, March 3, 1990, the defendant called Morris at his home and he answered the phone. Referring to his February 4th inquiry about the "For Sale" sign she told Morris that she had to sell because the bank is going to start a foreclosure, that she had to sell to pay the mortgage. She also told him that David had taken out the home equity loan which was involved in the potential foreclosure and that David had used it for a house that he built in Madison. Morris indicated that he knew nothing of this but that he would get back to her.
On the following night, i.e. Sunday, March 4, 1990 at about 6:30 p. m., Lynsey told the defendant that Morris was there. He had driven over to Dianne's house to see Dianne. Morris and the defendant had a lengthy talk, unlike any other talk the two had ever had. She discussed with him not only the Union Trust equity loan and David's doings concerning it but also the first mortgage, on both of which she told him that she became solely responsible under the divorce decree. Morris told her that he did not know of the results of that decree, that his family told him nothing and that she should not be responsible for two mortgages. He said that he wanted to help but first he wanted to know if David now had anything to do with the Laurelwood Road property. He said that he wanted to pay off the Union Trust mortgage but only if that there was not way that David could take any money out of that property and that he wanted to this for her and Lynsey. He also told that he had already been to see John Chamberlain at Union Trust. In their discussion that night he also spoke of others in the family.[6]
Two days later, on Tuesday, March 6, 1990, between 10:00 — 10:15 a.m. Morris came to Chamberlain's office at Union Trust, he had not called for an appointment. He drove his car to the bank and was alone. He went directly to Chamberlain's office. At that time he was wearing a dark topcoat and hat, appeared neatly dressed and "presentable" and carried a cane. Morris told CT Page 1863 Chamberlain that he wanted to pay off the home equity loan, that he did not approve of what his son David had done, that his wife did not agree with him and that he wanted his granddaughter to have a home. Chamberlain got some information that Morris wanted. Morris appeared to Chamberlain to be perfectly lucid, perfectly in command of what he wanted and coherent and in command of all his faculties. Chamberlain was with Morris all the time that Morris was in the bank at that time. Having told Chamberlain that he wanted to pay off the loan he gave Chamberlain a check and asked him to date it, insert the payment, to fill in the amount which Chamberlain did and then Morris signed the check,[7] The defendant did not participate in Chamberlain's dealings with Morris at the bank that day which Chamberlain said took about ten to fifteen minutes. On that date the defendant, who was at work received a telephone call from Union Trust informing her that Morris was at that bank. She left her work and went there to where Morris and Chamberlain were. Chamberlain had not called her. She learned what had transpired there before she arrived. Thereafter, she hugged Morris and thanked him and asked Chamberlain if he would be of assistance in helping Morris to his car as it was a stormy day. Between that day and Morris' death she would see Morris when she dropped Lynsey off for visitation with David who resided with his parents. Morris never came to visit her again. She did telephone him in March 1990 and spoke to him in inquiring about how he was feeling.
In assessing Morris' physical and mental condition on March 6, 1990 the greater part of the evidence came from family members together with Dr. Kellogg's testimony, who parenthetically had not seen or examined Morris between December 27, 1989 and his hospital stay of approximately four days in the third week of April 1990. John Chamberlain had, of course, seen and spoken to him on two occasions in 1990 and Kimberly Oog had not spoken to him since about September 1, 1989. Several things, however, are clear. Morris loved his granddaughter Lynsey. He rarely, at any time, discussed his financial affairs with anyone. He was not, at the very least, on very good terms with his two sons from, at least early 1989 on. He was steadfast in his resolution of not wanting to leave his money to his wife and two sons; Kellogg first noted this about April 1989 at which time it was his opinion that Morris was lucid. This physician noted that that feeling continued. Morris also had an "underlying suspicion" "of most caregivers and physicians." Here it may be noted in passing that Morris appeared to have a chronic depression but was resistant to undertaking recommended psychiatric intervention.
The lay testimony, on the one hand, ran the gamut from Morris to going physically downhill with his mind seeming to wander from January 1989 to January 1990, being "somewhat senile" from February 1989 on to being incapable of handling his affairs from CT Page 1864 January 1, 1990 on and in 1990 being "just out of it". There was testimony of his inability to recognize family members, some disorientation especially in late 1989 and on 1990 and the like. This testimony also included that he changed from the time he learned that he had cancer. The great bulk of the evidence touching the undue influence issue concerns later periods. On the other hand, there was family testimony that in April 1989 Morris and his brother Uria went over the figures Morris and Helen's income tax return before he signed it, that in either late December 1989 or early January 1990 Morris had Uria make out a check for $10,000.00 to Morris' grandson, Shaun Dolan to buy a car which Uria, at Morris' request, took to Morris' bank to have it certified. Uria saw Morris hand the certified check to Shaun. With reference to Morris and Helen's joint income tax return for 1989, Morris went to Uria's house probably a week or ten days before April 15, 1990, they discussed the figures. Morris appeared to Uria to understand it "exactly", he signed it and took it home for Helen to sign. Morris returned it signed to Uria who mailed it in about April 8 or April 9, 1990. During 1990 Morris seemed lucid to Uria whenever the latter spoke to him. Over the period from January 1, 1989 to April 22, 1990, Uria would see Morris in the average of at least once a week and sometimes more often.
Further, it is also useful in resolving the conflicts in the evidence in this case to consider Morris' conduct with reference to his generosity to those to whom he wanted to be generous at various times. In 1951 when Uria built his home, Morris offered to and did lend him the money to do so and he lent that money at the savings bank interest role rather than the interest rate that would be required with a bank mortgage. Later, Morris lent his son David $50,000.00 to build a house at #25 Pine Glen Terrace, Wallingford prior to his marriage to Joan Fishbein, his former wife. David could not recollect at this trial whether he gave Morris a mortgage for that loan. In any event, when this marriage was terminated by divorce in 1975, the court ordered David to convey his interest in that property to Joan and she, in turn, was ordered to give her promissory note for $30,000.00 to Morris. In 1986, shortly after the cancer was diagnosed and before he went into the hospital for it, Morris drew up a list of things to be done. The release of the mortgage from Joan Fishbein to Morris resulting from her divorce was on that list and, before he went into the hospital he executed a release of that mortgage which was recorded shortly thereafter.[8]
Three children were born to David and Joan Fishbein during their marriage: Jacqueline, Jeffrey and Sara. Morris paid $25,000.00 on Jacqueline's college tuition and he paid college tuition for Jeffrey and Sara. The gift of his fifty percent interest in the Fishbein insurance agency to his son John who took CT Page 1865 over the agency as or about January 1, 1989 has been referred to. Similarly, the gift of $10,000.00 by certified check to his grandson Shaun Dolan, in late December 1989 or early January 1990 has already been noted.[9] On March 4, 1990, the night that Morris went to the defendant's house, he mentioned to her inter alia that John Fishbein's house (which was four houses away from his residence) needed painting. Helen Fishbein testified that Morris had Joan's house painted in the spring of 1990. It is apparent that Morris had made gifts over the years including times at which his capability has been called into question.
The plaintiffs' post-trial brief argues that: ". . . on March 6, 1990 . . . Morris Fishbein, was an incompetent person, was incapable of managing his own financial affairs was subject to hallucinations and delusions perpetrated by the defendant and was unduly influenced by [the defendant] to pay off a home equity loan for her benefit on the home she owned in the amount $192,324.09 and she was unjustly enriched thereby." The court does not agree.
Initially, we point out that the plaintiffs do not, nor reasonably could they, on their claim on the evidence, maintain that Dianne occupied a confidential relationship with Morris. See Zack, Executrix v. Guzauskos, 171 Conn. 98, 104, 368 A.2d 193
(1976). Thus, the presumption of undue influence where such a relationship exists did not arise here and the burden on the issue is upon the plaintiffs.
The term "undue" in the phrase "undue influence" has not gone unnoticed by courts. Courts have recognized that, depending upon the circumstances, some influence is "due" and hence proper, while other is "undue" and hence improper. See e.g. In Re Estate of Price, 388 N.W.2d 73, 79 (Neb. 1986). In Re Reynolds Estate,132 N.J. Eq. 141, 27 A.2d 226 (1942).
Evidence found credible including those of Morris' condition, character and strengths have been set out above. To flesh out, however, the time frame from February 4, 1990 to March 6, 1990 the court also finds that on February 17, 1990 or shortly thereafter Morris gave his check payable to his sons, John and David, in the amount of $17,057.27 which was for moneys he owed them for certain wages at the agency. This amount was determined from, according to John Fishbein, discussions that spaced over eleven months during which Morris had been shown the books and the records. Both sons endorsed the check and it was deposited. No valid claim can be made that Morris did not know what he was doing when he gave this check and the evidence concerning this at the trial bore this out. It was given after he had first noticed the "For Sale" sign on the defendant's house albeit before Morris and Dianne had their discussion of March 4, 1990 which would be about two weeks later. CT Page 1866
It is also important to point out that while Dr. Kellogg's report of April 24, 1990 to the probate court, states that Morris' problems included "Alzheimer Dementia — mild but progressive" Kellogg said this was applied to him formally during his April 1990 hospital and not prior thereto. No evidence from Dr. Kellogg never mentioned Alzheimer's over his entire course of treatment up to April 1990 He also noted under "Mental Condition" that Morris' "Memory of recent events limited and poor" but at the trial he said he felt that existed from his April 1990 hospitalization forward and, in any event, he had not examined him for memory difficulty prior to his April 24, 1990 examination for the probate court. The "Midly paranoid of family members with ongoing and unusual estrangement from most of immediate family" statement in Dr. Kellogg's report existed from January 1, 1989 long before this examination. Although the cancer had spread, Dr. Kellogg reported that "CT scan negative for metastasis to brain." The comment in Dr. Kellogg's probate report that Morris "most recently was found wandering at 6 a.m. in his own neighborhood, unable to say how or why he [Morris] was there" was a new matter said the doctor as that had never happened before. The report itself expresses doubts by Dr. Kellogg of hallucinations reported by Morris.
Morris loved Lynsey, his ten year old granddaughter. His past relationship with Dianne does not, in and of itself, suggest that he could be improperly influenced by Dianne despite his feeling for Lynsey to accomplish a result that he did not wish to accomplish. Moreover, the circumstance that Dianne did call him after his inquiry of February 4, 1990 and then speak to him in person can be said to have given her, sensing Morris' feeling for Lynsey, opportunity to influence him. Mere opportunity to do so, however, is not sufficient. See e.g. In Re Anderson's Estate,353 Mich. 169, 91 N.W.2d 356, 358 (1988); In Re Carter's Estate286 Mass. 237, 249, 190 N.E. 493 (1934). Nor does opportunity and disposition to exercise it alone make it sufficient to prove undue influence. See e.g. In Re Farr Estate, 33 N.W.2d 454, 461 (Neb. 1948). Even appeal to affection, request and persuasion that do not destroy the free agency of the donor or testator, assuming it exists do not of themselves amount to undue influence. Lee v. Horrigan, supra; see Appeal of Turner, 72 Conn. 305, 44 A. 310
(1899); In Re Hollis' Estate, 12 N.W.2d 576, 581 (Iowa 1944); In Re Farr's Estate, supra; In Re Estate of Mott, 205 N.W. 770 (Iowa 1925). It must be proven that the opportunity and disposition to exercise undue influence was actually exercised with the result that Dianne's control and dominion over Morris' will was such as to destroy his free agency and constrain him to do that which he would not have done if such control had not been so exercised. This means showing that the influence exerted upon Morris' in effect substituted her will for his thereby making the transaction CT Page 1867 on March 6, 1990 the fulfillment of her purpose and intent and not that of Morris. It must, if present, exist at the time of the transaction involved, here the check giving of March 6, 1990. See Marconelli v. Starkweacher, 104 Conn. 419 A (1926), Hills v. Hart, 88 Conn. 394, 91 A. 257 (1914); In Re Hollis Estate, supra. What Morris did was the result of his free and deliberate judgment in carrying out his intent and purpose to do that which he was capable of doing and determined to do, it has not been proven to have been the result of undue influence as claimed. He was capable of managing his own affairs and understood what he was doing. He was not suffering from delusions perpetrated by the defendant as claimed. His actions were the product of his own free agency; that had not been dominated or destroyed by the defendant by the exertion or exercise of undue influence upon him.
It is undoubtedly true that, when discovered by members of his immediate family, it was considered unjust or unwise or both by those now seeking to set it aside. Our law, however, is that a person who possesses the necessary capacity may dispose of his or her property as they wish even though a court might consider it "unjust or unwise", Clark v. Portland Burying Ground Association,151 Conn. 527, 531, 200 A.2d 468 (1964); Marconelli v. Starkweather, supra, 429. The same applies where a disposition of property is made where hostility to certain family members can be found to be implicated. See e. g. Marconelli v. Starkweather, supra 427; Hills v. Hart, supra.; Sturdevant Appeal from Probate,71 Conn. 392, 397, 42 A. 70 (1898) In Re Estate of Kleeb,320 N.W.2d 459 (Neb. 1982); Calhoun v. Calhoun, 290 S.E.2d 418 (S.C. 1982). That existed here. It is also strongly suggested that paying off of the Union Trust mortgage was unnatural under the circumstances. Quite the contrary, keeping in mind that each disposition must be evaluated under all the surrounding circumstances of the particular case involved. See e.g. Casper v. McDowell, 58 Wis.2d 82, 208 N.W.2d 153 (1973). In Re Estate of Von Rucken, 55 Wis.2d 365, 198 N.W.2d 583 (1972). The plaintiffs have not sustained the burden of proof of a fair preponderance of the evidence on the issue of undue influence.
The plaintiffs also claim that this matter falls under the doctrine of unjust enrichment because the defendant has received a benefit which was unjust and was not paid for by her to the detriment of the plaintiff in that Morris' decedent estate has been substantially decreased by the amount of the payment. The plaintiffs argue for the imposition of a constructive trust upon the defendant's Laurelwood Drive property because quity acknowledges such a trust as a remedial device to prevent unjust enrichment. The defendant resists these claims arguing in effect that the plaintiff have not proven that the unjust enrichment doctrine is applicable and therefore no constructive or resulting trust should be imposed. The court cannot accept the claims of CT Page 1868 the plaintiffs.
 "Unjust enrichment applies `wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.' 5 Williston Contracts (Rev. Ed.) 1479. `A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215; Schleicher v. Schleicher. 120 Conn. 528, 534, 182 A. 162.' Connecticut National Bank v. Chapman, 153 Conn. 393, 399, 216 A.2d 814. `With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard.' Cecio Bros., Inc. v. Greenwich, 156 Conn. 561, 564-65, 244 A.2d 404."
Providence Electric Company, Inc. v. Sulton Place Inc., 161 Conn. 242,246, 287 A.2d 379 (1971). The question is: Did the defendant receive a benefit which on equity and good conscience she should not retain but should return to the plaintiffs? See Hixon v. Allphin, 76 Idaho 327, 333, 281 P.2d 1042 (1955) cited in Connecticut National Bank v. Chapman, 153 Conn. 393, 399,216 A.2d 814 (1966).
The defendant did receive a benefit. The circumstances' surrounding it, including the court's resolution of the undue influence claim set out at great length, clearly demonstrate that it is not contrary to equity and good conscience for her to retain it. The defendant maintain that it was a gift as set out above. The defendant, as noted has demonstrated that it was a valid gift. Moreover, she has proven that Morris' intent in making that gift included that the payment to Union Trust on the defendant's behalf included that its being free and clear of any claim his family members. The plaintiffs have not sustained their burden of proof on unjust enrichment.
The plaintiffs also claim that a constructive trust should be imposed upon the defendant's Laurelwood Drive property. This claim is essentially academic given the resolution of issues CT Page 1869 above. We do note, however, that Cohen v. Cohen, 182 Conn. 193,203, 438 A.2d 55 (1980) does state that "The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment . . . a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." See also Heible v. Heible, 164 Conn. 56, 316 A.2d 777 (1972); Scott Trusts (4th ed 1987), 44.2 pp. 451 et seq.; 4 Pomeroy's Equity Jurisprudence (5th Ed.) 1053, p. 119. The plaintiffs have not demonstrated that they are, at all entitled to the imposition of a constructive trust. In any event, to do so in this case would be inappropriate.
While it is not at all clear if the plaintiffs also claim the imposition of a resulting trust on the defendant's Laurelwood Drive property, the law and the evidence do not justify its imposition. Not only have the plaintiffs failed to sustain the burden of proof for doing so but the factual predicate for it is not present, given our "well settled" law on resulting trusts in Connecticut. See Farrah v. Farrah, 187 Conn. 495, 500,446 A.2d 1075 (1982), see also Lord v. Stavrakis, 6 Conn. App. 161, 162,503 A.2d 629 (1986).
The issues on the complaint are found for the defendant and judgment is ordered to be entered in favor of the defendant.
Arthur H. Healey State Trial Referee
FOOTNOTES