BARBARA H. LEE, CONSERVATRIX (ESTATE OF THOMAS R. HORRIGAN) *v.* BEATRICE HORRIGAN, EXECUTRIX (ESTATE OF THOMAS J. HORRIGAN)

BROWN, C. J., BALDWIN, INGLIS, O'SULLIVAN and CORNELL, JS.

Argued June 10—decided July 28, 1953

*Denis T. O'Brien, Jr.,* with whom was *Denis T. O'Brien, 3d,* for the appellant (defendant).

*Nathan A. Resnik,* with whom, on the brief, was *Cornelius T. Driscoll,* for the appellee (plaintiff).

BROWN, C. J.   Thomas J. Horrigan of Meriden died on March 19, 1952, leaving an instrument dated May 16, 1951, which on April 25, 1952, was admitted to probate as his last will and testament.  From this decree the plaintiff, as conservatrix of her brother, Thomas R. Horrigan, an incompetent son of the testator, appealed to the Superior Court, alleging lack of testamentary capacity, and undue influence by Beatrice Horrigan, the testator's second wife.  Upon the trial in the Superior Court the defendant's motion for a directed verdict was denied and the jury, in answer to interrogatories, found for the defendant on the issue of testamentary capacity, but for the plaintiff on that of undue influence, and that the instrument was not the last will of the decedent.  The court denied the defendant's motion to set aside the verdict and rendered judgment that the instrument was not the last will of Thomas J. Horrigan.  The determination of the question presented by the error assigned in the court's denial of this motion disposes of the case, rendering discussion of the other assignments unnecessary.  That the court properly instructed the jury as to the law is not questioned. We refer to the defendant executrix, in her individual capacity, as the defendant.

Upon the evidence the jury could reasonably have found the following facts: The testator had conducted a furniture and trucking business in Meriden for many years. He and his wife, Rose, had raised a family of four daughters, who had married, and an incompetent son, Thomas R. Horrigan. In the spring of 1947, when the testator was sixty-seven years of age and his son thirty-three, Rose Horrigan died and the testator sold out his business for $45,000. After his wife's death he continued to live in the home with a housekeeper and his son, for whose future welfare he was considerably concerned. Up to the time of the testator's marriage to the defendant as his second wife on February 10, 1948, he was on affectionate terms with his daughters and their families. They visited him frequently and he often gave them gifts.

In 1947 the defendant, a registered nurse forty-seven years of age, was living in Boston. She was married but had been separated from her husband since 1943. Prior to 1936 she had been connected with the hospital in Meriden and upon moving to Boston had stored her furniture with the testator. In the summer of 1947 she returned to attend to this furniture and was notified that the testator had sold the business. He told her of his wife's death and took her and one of his daughters out to dinner. On his invitation, she spent the night in his home. On two subsequent occasions that fall she returned to Meriden, each time to attend a party, and both times spent the night or longer in the testator's home. While it is conceded that there were no immoral acts between her and the testator during her visits, both of them did become intoxicated. The testator entertained her on another visit during the 1947 Christmas holidays. In contemplation of marrying the testator, and at his expense, the defendant instituted a divorce

action against her husband. The husband died on January 14, 1948, before the divorce was heard, and on February 10, 1948, nine months after the death of the testator's wife Rose, he and the defendant were married. His daughters objected on the ground that in remarrying so soon he showed a lack of respect for their mother and also because they were under the misapprehension that the defendant was a divorced woman.

After taking a wedding trip to Florida, the couple returned to live in the testator's home. In 1950 the defendant joined the Catholic church, of which the testator and his family had long been members. The testator's son, who worked at odd jobs, lived with his father and the defendant. On May 16, 1951, the will in question was executed. In November, 1951, the testator suffered a coronary thrombosis. Thereafter the defendant seldom allowed his daughters to visit him, claiming that the doctor advised that he should not have visitors, although she allowed others than members of his family to call upon him. Whenever members of the family were there, she never left them alone with him. In January, 1952, the defendant and the testator left for Florida, where he died on March 19, 1952. He was buried in Meriden.

The testator had often declared that he would make no will, because the statutes, giving one-third to his widow and two-thirds to his children, afforded a just disposition of his property. During 1950 he contracted an infectious eczema and thereafter he required medical treatment involving the continuous taking of sedatives. During this time the defendant plied him with intoxicating liquor and he became a heavy drinker, rather than a moderate one as he had been before marrying the defendant. The defendant was a possessive and domineering person, who, after

the marriage, told him what he could and what he could not do. Upon the testator's death his own property was appraised at $36,062 and that jointly owned by him and the defendant with right of survivorship at $29,780.

The testator's son, Thomas, while living in the home during the months prior to the execution of the will, heard repeated and violent arguments between the defendant and his father concerning his will. At times they were so prolonged that he retreated to the room in the cellar which his father had fitted up as a recreation room for him in order to get a night's sleep, and on one occasion in the violence of the discussion he saw the defendant throw dishes at the testator. The defendant was demanding that the children should receive but $1000 apiece and that she should have the rest. She promised Thomas that she would give him $25 if he would tell no one about these arguments. Finally, upon the testator's failure to comply with the defendant's demands, she left early in May, 1951, and returned to Boston. Very shortly thereafter, the testator instructed an attorney to prepare the will on the terms which he specified and on May 16, 1951, he returned to the attorney's office and executed it. The will left $1000 to each of his five children, who, with the defendant, constituted his sole heirs at law and next of kin, and the rest, after the payment of debts, to her, and it named her as executrix. On May 19, 1951, the testator appeared outside of his church when two of his grandchildren had their first communion, looking unkempt and unshaved, and he acted as though ashamed to face the members of his family. Shortly after, he telephoned to the defendant and she returned from Boston. During the same month, he purchased the property adjoining his home for $10,000, and had the deed made

out to himself and the defendant jointly, and to the survivor. That summer he erected a valuable building on the property. Concerning such gifts as the testator made to his children after marrying the defendant, he cautioned them not to inform her. The defendant promised never to turn Thomas out without providing for him, but the day after the funeral she ordered him out of the house, and only allowed him to return for six months when advised to do so by her attorney.

Many years ago this court held the following to be a correct statement of what constituted undue influence sufficient to invalidate a will: "[T]he degree of influence necessary to be exerted over the mind of the testator to render it improper, must from some cause or by some means be such as to induce him to act contrary to his wishes, and to make a different will and disposition of his estate from what he would have done if left entirely to his own discretion and judgment. That his free agency and independence must have been overcome, and that he must, by some dominion or control exercised over his mind, have been constrained to do what was against his will, and what he was unable to refuse and too weak to resist. But that moderate and reasonable solicitation, entreaty or persuasion, though yielded to, if done intelligently and from a conviction of duty, would not vitiate a will in other respects valid." *St. Leger's Appeal,* 34 Conn. 434, 442, 449. Subsequently we reiterated the above principle and amplified it as applied to a case where there was no direct evidence of undue influence, in these words: "It is conceded that no direct evidence of undue influence was adduced, and none was necessary, provided the foundation was laid for a reasonable inference that the will was not such as the testator would have made, if

left entirely to his own discretion, and that his free agency and independence had been overcome, so that he was constrained to do what he was unable to refuse and too weak to resist. *St. Leger's Appeal,* 34 Conn. 434, 442. On the other hand, the rule which dispenses with the necessity of direct proof of undue influence, does not relieve the contestant from the burden of laying a 'safe foundation of material facts proven, and inferences which fairly and convincingly lead to that conclusion.' *Hills* v. *Hart,* 88 Conn. 394, 397, 91 Atl. 257." *Downey* v. *Guilfoile,* 93 Conn. 630, 631, 107 A. 562. More recent decisions which have reaffirmed the principle determinative of the existence of undue influence are: *Preston* v. *Preston,* 102 Conn. 96, 109, 128 A. 292, and *Bucchi* v. *Gleason,* 137 Conn. 25, 30, 74 A.2d 212.

Further explanation of just what is meant by "pressure" constituting undue influence, and of the significance of circumstantial evidence in such cases, particularly apropos in the instant case, is well set forth as follows: " 'Pressure of whatever character, whether acting on the fears or hopes—if so exerted as to overpower volition without convincing the judgment—is a species of constraint under which no will can be made. Importunity or threats, such as the testatrix has not the courage to resist, moral command asserted and yielded to for the sake of peace and quiet, or of escaping from distress of mind or social discomfort—these, if carried to a degree in which the free play of the testatrix's judgment, discretion, or wish, is overborne, will constitute undue influence, though no force was either used or threatened. The existence and exercise of such undue influence is not often susceptible of direct proof. It is shown by all the facts and circumstances surrounding the testatrix, the family relations, the will, her

condition of mind, and of body as affecting her mind, her condition of health, her dependence upon and subjection to the control of the person influencing, and the opportunity of such person to wield such an influence. Such an undue influence may be inferred as a fact from all the facts and circumstances aforesaid, and others of like nature that are in evidence in the case, even if there be no direct and positive proof of the existence and exercise of such an influence.'" *Hobbes' Appeal,* 73 Conn. 462, 467, 470, 47 A. 678; *Dale's Appeal,* 57 Conn. 127, 134, 147, 17 A. 757. "The ultimate question is, upon the evidence could the jury reasonably have drawn the inference of undue influence?" *Hills* v. *Hart,* 88 Conn. 394, 399, 91 A. 257. We have quoted the above principles at length to make clear the test decisive of this appeal.

No extended dissertation is required to make clear its application. Among the more important facts warranting an inference of undue influence are the natural mood and state of mind of the testator, consequent upon the recent death of his wife and sale of his business, which afforded the defendant full opportunity to initiate this romance; the difference of twenty years in their ages; her immediate and persistent follow-up of the opening so afforded, which, notwithstanding the protests of his daughters, eventuated in the marriage twenty-seven days after her first husband's death had removed the only legal obstacle; her interference with the cordial relationship previously existing between the testator and his children; the effect of the sedative drugs and of the intoxicating liquor with which she plied him; the repeated assertions of the testator, even while the wife who raised his family was living, that he would make no will because the statutory provision for one-third to the wife and two-thirds to the children af-

forded a proper disposition of his property; his execution of the will shortly after the defendant left him to return to Boston; his appearance shortly after its execution, indicating that he was ashamed to face his family; and the terms of the will which, in connection with the joint ownership of his realty and government bonds bestowed upon her, gave somewhat less than 8 per cent of his total property to his five children and the other 92 per cent to her, except that $4700 was provided for Thomas by a policy of insurance upon his father's life.

The defendant argues that even if the jury found the foregoing facts, since their verdict established that the testator was of sound mind, they were unwarranted in inferring undue influence because she offered direct testimony that he was not a man who could be easily influenced, and that there was no indication that the fact of his having become a heavy drinker after the marriage affected him at all in this respect. She further contends that the natural appeal to the jury's sympathy by reason of the situation of the son Thomas, and the emphasis thereon as the case was presented, show the injustice of the verdict. Upon this record it certainly cannot be so held as a matter of law. The question was clearly one for the jury's determination under proper instructions, which admittedly were given by the court. If there could be any doubt that the inference was justified, the testimony of Thomas leaves no doubt that the jury's finding of undue influence was amply warranted. This was direct evidence, which, as this court has repeatedly remarked, is seldom available in such cases, of what the defendant did in this connection. While Thomas is referred to as an incompetent, his capacity to testify was not challenged and the weight to be accorded his testimony was for the jury to

determine. His recital of the defendant's prolonged and violent insistence that the testator make a will with the precise provisions which this will contains, and of her promise to pay him $25 not to tell what he heard, if believed by the jury, when considered in connection with the other circumstances, leaves no doubt that the verdict was warranted. The evidence justified the court's denial of the motion to set it aside. Furthermore, in deciding whether the court abused its discretion in so ruling, great weight is due to its conclusion. *Cables* v. *Bristol Water Co.*, 86 Conn. 223, 225, 84 A. 928. The court did not err in denying the defendant's motion. *State* v. *Hayes,* 127 Conn. 543, 553, 18 A.2d 895.

There is no error.

In this opinion the other judges concurred.