[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On January 16, 1991 by agreement of the mother, Charles, born November 3, 1984, was committed to the Department of Children and Youth Services (DCYS) as uncared for (specialized needs). The father is unknown. The court on May 15, 1991 terminated the paternal rights of the mother based on her written consent.
On December 20, 1991, the terminated biological mother (petitioner) filed a writ of habeas corpus seeking custody. The petition asserts a lack of subject matter jurisdiction in the termination proceedings because the sole ground, consent, had not been voluntarily and knowingly given: the mother had succumbed to undue influence.
The petitioner has been represented by counsel during all court process from 1990 even though new counsel acts in her behalf on the habeas corpus petition. The attorney for the child has remained the same. The assistant attorney general who represented DCYS during the commitment and termination proceedings also participated in the instant petition though the hearing itself was conducted by a colleague.
The court has ruled twice on preliminary motions and those memoranda are incorporated herein. In accordance with those memoranda, the court took testimony on undue influence and now finds that there was no undue influence.
The petition for a writ of habeas corpus is denied.
I CT Page 861
A writ of habeas corpus cannot substitute for an appeal, writ of error or petition for new trial. Wojculewicz v. Cummings, 143 Conn. 624, 628, 124 A.2d 886 (1956). The mother does not seek to reopen the judgment. See, In Re Baby Girl B., 224 Conn. 263, ___ A.2d ___ (1992). Habeas corpus was not used as a deliberate bypass of regular procedures. McClain v. Manson, 183 Conn. 418, 439 A.2d 430 (1981).
It is not clear whether a habeas corpus can be brought after termination to establish a record to cover events not occurring in the courtroom or in the hearing record. See, In re Alexander V., 223 Conn. 557, 571, fn. 12. ___ A.2d ___ (1992); McClean v. Robinson, 189 Conn. 663, 668-669,457 A.2d 1072 (1983).
Nevertheless, habeas corpus must be brought by one with standing. Standing questions whether the party bringing the petition is the proper party to request an adjudication. Standing can be elusive and is met when a petitioner makes a colorable claim of direct injury in an individual or representative capacity. Board of Pardons v. FOI Commission,210 Conn. 646, 648-649, 556 A.d 1020 (1989). It is axiomatic that standing must be proven.
Habeas Corpus relates only to custody, including visitation, and does not effect guardianship. Habeas Corpus petitions have been reserved to parents or legal guardians. Nye v. Marcus, 198 Conn. 138, 502 A.2d 869 (1985). 52-466 (b) now gives at least limited standing specifically to foster parents or approved adoptive parents. Compare 46b-59 reference to "any person."
Because the mother's rights were terminated on May 15, 1991, the state claims the petitioner has no standing to bring a habeas corpus. Termination is the complete severance by court order of the legal relationship including guardianship, with all its rights and responsibilities, between child and parent. Gen. Stat. 17a-93 (e). In effect, the mother is a legal stranger to the child with no better claim to advance the best interests of the child than any remote stranger. See In re Jason P., 41 Conn. Sup. 23, 549 A.2d 286 (1988).
On the other hand, the petitioner asserts that without a valid consent from her, the court lacked subject matter jurisdiction to enter a valid termination order so she remains CT Page 862 a legal parent seeking custody in the best interest of the child. McGaffin v. Roberts, 193 Conn. 393, 479 A.2d 176
(1984).
 II
Undue influence is exercise of sufficient control over the petitioner to destroy her free agency and constrain her to do something other than she would under normal control. While the petitioner does not claim lack of competency; In re Alexander V., supra; she does suggest her level of competency is relevant on undue influence. Undue influence may be proven circumstantially depending on relevant circumstances. Reynolds v. Molitor, 184 Conn. 526, 440 A.2d 192 (1981); Pickman v. Pickman, 6 Conn. App. 271, 275-276, 505 A.2d 4
(1986). While improper influence must induce action contrary to a person's wishes, ". . . moderate and reasonable solicitation, entreaty or persuasion, though yielded to, if done intelligently and from a conviction of duty, would not vitiate a (will) in other respects valid." Lee v. Harrigan,140 Conn. 232, 237, 98 A.2d 909 (1953). Discussion by social workers, therapists or attorney with the mother reviewing factors which might tend to favor consent is not necessarily undue influence. Undue influence must amount to coercion or fraud. D'Agostino v. D'Addio, 6 Conn. App. 187, 188,504 A.2d 528 (1986).
Because fraud is implicated in undue influence, the usual high standard of proof might be imposed. Proof of fraud has been described as clear and satisfactory and clear, precise and unequivocal evidence. Kilduff v. Adams, Inc.,219 Conn. 314, 593 A.2d 478 (1991). Fraud must be "strictly proven by clear, precise and unequivocal evidence." Bound Brook Assoc. v. Norwalk, 198 Conn. 660, 666, 504 A.2d 1047
(1986). Whether the higher standard of proof does apply on the issue of undue influence has not been resolved. Taite and LaPlante's Handbook of Connecticut Evidence, 4.5.4(c) p. 85.
Conceptually a distinction may be made between standing here and the subject matter attack on the termination proceedings. Under the posture of this habeas petition, the factual issues are identical: undue influence. But whether the level of proof is a regular preponderance (particularly for standing) or the higher fraud standard, the petitioner's evidence did not pass either test. Even if she showed CT Page 863 standing, she failed to prove a lack of subject matter jurisdiction on May 15.
 III
The petitioner was evaluated in December 1990 by Dr. David M. Mantell, a licensed clinical psychologist in December 1990 in connection with the proceedings to commit the boy to DCYS in January 1991. Psychological testimony from professionals is accorded great weight. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 667, 420 A.2d 875 (1979). See, In re David E., 4 Conn. App. 653, 657, 496 A.2d 229 (1985). Dr. Mantell described the petitioner as a low borderline intelligence which greatly narrows her range of independence. She has a limited capacity to process and consider reflectively.
Functioning above the level of a fifth grader in school, the petitioner had the ability to ask for explanations. She has the cognitive ability to understand the concept of placement. Dr. Mantell saw no effect on cognitive ability because of any chronic depression. While the petitioner has a dependent personality, she still had a mind of her own and an ability to define her issues and assert them. While the psychologist was unable to fix her degree of reliance, her ability to resolve concepts would be facilitated by her past exposure so her experience prior to May 15 would have made it easier for her to understand the termination proceedings.
About April 1990 using a private adoptive services, the petitioner voluntarily placed Charles in a pre-adoptive home. Shortly thereafter, the placement failed because of the child's behavior and he went into DCYS custody under a voluntary placement signed by the petitioner on June 1, 1990.
The goal of DCYS was family reunification. 17a-101
The foster mother was cautioned not to review maternal goals as DCYS was to be the single source. The petitioner was indecisive about adoption by that foster mother. DCYS shifted the boy to a different foster mother by August 9, 1990.
The neglect/uncared for petition was filed September 7, 1990. At the commitment, the petitioner signed Court Expectations. Exhibit 3. The mother recalls Judge CT Page 864 Brenneman's warning that failure to meet expectation could create the risk of termination.
DCYS emphasized the need for permanency. The petitioner was cautioned by the agency that it would move to terminate if she could not provide a satisfactory permanent plan for the child. Exhibit 2 and 5. The petitioner had problems with her boyfriend and the child, and had difficulty with visitation. She had a dependent type relationship with her boyfriend. The petitioner understood that the purpose of counselling was to reunite mother and son. She also understood the adoption option meant her son would live in a permanent home. She was advised of the need for a speedy decision to provide stability.
Although Wheeler Clinic therapist Georgis had prompted the petitioner to consider permanency planning as of April 1, 1991, the petitioner was resistant to discussing adoption as an option. Exhibit 6. Yet on April 11, 1991 the therapist reported in her progress notes that the petitioner told Charles that the "state is going to look for an adoptive home for him and she hopes it will be a home that permits her to continue seeing him." The Wheeler Treatment Plan Review of May 1, 1991 reported that mother and child "having a a very difficult time discussing adoption but they work at it consistently." Exhibit 7.
Without progress on permanency planning, DCYS filed for termination. This six year old boy had been in at least three foster homes from 1990. On May 15, 1991, the petitioner was provided transportation to the courthouse by an unidentified DCYS worker (not Rosalyn M. Kinne). The worker told the mother to do what is best for her son: "If couldn't give home, wouldn't you like to give child a home?" At the courthouse, the attorney for the petitioner approached DCYS for a conference. The petitioner believed she would lose on the termination trial. At the courthouse conference, the mother with her lawyer, the child's lawyer, DCYS worker and an assistant attorney general were the only participants.
DCYS did not anticipate a consent and at no time spoke to the petitioner in the courthouse in the absence of her attorney. On May 15, DCYS agreed to attempt an open adoption without any guarantee. The petitioner concedes her attorney did not make her decision to consent. The lawyer was present CT Page 865 when she signed the consent and was present when she was thoroughly canvassed by Judge Brenneman on May 15. There is no claim of ineffective assistance of counsel. The mother understood what she was doing during the judicial questioning. The court took judicial notice of the transcript of the May 15 transcript.
In June 1991, the petitioner participated in a "good by" visit with Charles; a tape was made for him.
The petitioner suggests that her problem in May was her boyfriend. Now, apparently free from him, she seeks return of Charles. After termination she claims to have called DCYS to seek return of Charles. The concern at this proceeding is not focused on her changing living arrangement but whether there was undue influence on May 15. The boyfriend is not mentioned in the habeas corpus petition. While the petitioner may have changed her mind about the termination, the issue is her state of mind at termination.
The petitioner had the ability to understand what was expected, even if she needed guidance on details. She could understand, for example, the Court Expectations. She understood short and long term placements. As the consent form was explained and canvassed, she would have had a good general understanding.
If any pressure was exerted on the petitioner, it was to make a decision on her son's future with her or without her. Counselling on the ill effects of indecision was not undue influence. Anno.: Undue Influence, 50 A.L.R.3d 918; Anno: Mistake or Want of Understanding, 74 A.L.R.3rd 489. The petitioner could not shelve her child while she worked out her personal problems. Resources were there if she had elected reunification. Unable or unwilling to accomplish reunification, adoption in the best interest of the boy was a logical alternative. Her consent on May 15 was not caused by undue influence; indeed, it may well have been influenced by a parent's love for her child.
The petitioner may regret her May 1991 consent. However much one might sympathize with her sense of loss, she has failed to show that her decision was the result of undue influence. The court therefore does not address any issue of best interest of the child. See Doe v. Catholic Family CT Page 866 Services, 36 Conn. Sup. 93, 412 A.2d 714 (1979), a habeas corpus petition where the issues were also bifurcated.
The attorney for the child opposes the petitioner for habeas corpus.
 IV
Accordingly, the petitioner for a writ of habeas corpus is denied.
Samuel S. Goldstein, J.