[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Union Trust Company, the plaintiff, ("Trustee") commenced this action seeking a judgment approving its account as trustee under a trust agreement with Joseph A. Werle ("Werle") dated March 26, 1980. (Exhibit A). At the time of trial all parties entered into a written stipulation dated and approved by the court May 3, 1995.
The written stipulation as appears on file dated May 3, 1995 provided that judgment enter approving Exhibits J, J2 and J3 and payment of the expenses listed on Exhibit K as amended, attached to the written stipulation, (First and Second Counts). Accordingly judgment is entered on the First and Second Counts.
The Third and Fourth Counts are in dispute. The Trustee commenced this action in the form of an interpleader as to the Third and Fourth Counts. CT Page 10095
The Third Count addresses Article Third of Werle's Will (Exhibit C) wherein it alleges inter alia that in purported codicils to his Will Werle changed the amounts and beneficiaries of his cash bequests; "Paragraph 26 and 27 allege as follows:
26. The plaintiff as Trustee is ready to carry out the provisions of Article Third of the Trust Agreement (Exhibit A) and pay such cash bequests under the Will and/or codicils of Joseph A. Werle as the Court may direct, except that various claims and questions have arisen concerning the validity of some or all of Mr. Werle's codicils.
27. The plaintiff cannot with safety to itself or the rights and interests of other parties carry out its duties as trustee and pay cash bequests under the Will and codicils without the advice of the Court as to the validity of Mr. Werle's codicils.
The Fourth Count alleges inter alia under the below paragraphs:
"23. Article Fourth of the Trust Agreement before it was amended (Exhibit A) directs the plaintiff trustee to divide the trust property remaining after the grantor's death and after certain payments described in Article Third of Exhibit A, into two equal shares.
24. Because the grantor's niece Rheta Jones died before the grantor and all three of her children survived the grantor, Article Fourth of Exhibit A directs the plaintiff to distribute one share or the trust property, free of trust in equal parts to Rheta Jones' children, William C. Jones, Jr., Robert W. Jones, and Lynnette Jones Tracadas.
25. Article Fourth of Exhibit A directs the plaintiff to hold the remaining share of the trust property in trust for the benefit of the grantor's other niece, Beatrice Zehrbach, and her issue. The plaintiff is given discretion to make payments of income and principal to or for the benefit of Beatrice Zehrbach and her issue during the life of Beatrice Zehrbach.
26. Under Article Fourth of Exhibit A, Beatrice Zehrbach has a limited power to appoint the trust remainder of her share. To the extent she fails effectively to exercise such power, such trust remainder upon her death passes in equal shares, per stirpes, to her issue. If no issue of hers survives her, such trust remainder passes in equal shares, per stirpes, to the issue CT Page 10096 of Rheta Jones who survive Beatrice Zehrbach.
27. The amendment dated March 4, 1992 (Exhibit B), purports to change the beneficiaries described in Article Fourth of Exhibit A. Exhibit B directs the plaintiff to divide the balance of the trust property remaining after certain payments described in Article Third of Exhibit A, into two equal shares and pay one share free of trust to Elizabeth Behrmann and one share free of trust to Helen M. Smith.
28. The plaintiff as trustee is ready to carry out the provisions of the Trust except that various questions have arisen and claims have been made as to the validity of the amendment dated March 4, 1992 (Exhibit B).
29. The plaintiff cannot with safety to itself or to the rights and interests of other parties carry out its duties as trustee and distribute or administer the Trust estate without the advice of this Court as to the validity of the amendment dated March 4, 1992 (Exhibit B).
On November 15, 1993 (Fracasse, J.) entered an order Pleading #128 that the defendants interplead "their differences by stating their respective claims to the Trust Assets."
On March 4, 1992 Werle executed an "Amendment of Trust Agreement", Exhibit B, which instructed the Trustee to divide the balance of the Trust Fund created by the Original Trust dated March 26, 1980 (Exhibit A) between the defendants Elizabeth Behrmann ("Behrmann") and Helen Smith ("Smith"). The original beneficiaries under the Trust were two nieces Rheta Jones and Beatrice Zehrbach, and in the event either niece predeceased the grantor, Werle, even that share would be distributed per stirpes. Rheta Jones, a niece predeceased Werle and her share would be distributed equally between Rheta's children Lynnette Jones Tracadas, Robert Jones and William C. Jones, Jr. Beatrice Zehrbach ("Zehrbach") at the time of Werle's death had survived him. For purposes of this decision and the real parties in interest, Behrmann and Smith (unrelated to grantor) is one group of defendants, the Tracadas's line, related to the grantor, is another group of defendants, and Zehrbach, Robert W. Jones and William D. Jones's line is the other group of defendants also related to grantor. Each group of defendants filed statement of claims as on record. Each group of defendants was represented by different counsel. Each group of defendants are either CT Page 10097 beneficiaries or potential beneficiaries.
The issues raised by the statement of claims and responses are as follows:
Tracadas's line hereinafter ("Tracadas") claim:
The Amendment of Trust Agreement on March 4, 1992 ("Amendment Trust") which extinguished the interests of these defendants is (A) void due to lack of testamentary capacity and therefore the Trust Agreement Exhibit A as originally drafted controls the distribution of the Trust; and (B) that the Amendment Trust dated March 4, 1992 was executed under undue influence by Behrmann and or Smith and therefore invalid.
 Zehrbach, Robert W. Jones. William D. Jones hereinafter ("Zehrbach/Jones") claim:
(A) That Werle lacked testamentary capacity on and prior to March 4, 1992 to execute the Amendment Trust March 4, 1992 which eliminates Zehrbach's interest in the Trust; and also that Werle lacked testamentary capacity on and prior to April 12, 1991 when he executed the ("1991 Codicil") see (Exhibit C6); and on and prior to March 4, 1992 see (Exhibit C7)
(B) That Behrmann and Smith at all relevant times exerted undue influence on Werle when he executed the instruments in favor of Behrmann and Smith.
Behrmann/Smith claim:
(A) That Werle had the testamentary capacity on March 4, 1992 when he executed the Amended Trust which changed the beneficiaries under his Trust. That Werle had the testamentary capacity on April 12, 1991 when he executed the 1991 codicil.
(B) Both the Codicil of March 4, 1992 and the Amended Trust Agreement of March 4, 1992 are valid legal instruments.
(C) That Werle did not, on any dates mentioned, make disposition of his estate by reason of any undue influence or improper conduct of Behrmann and or Smith.
Dr. Joseph A. Werle, a well known and recognized economist established the revocable inter vivos Trust Agreement in 1980 CT Page 10098 (Exhibit A). The named beneficiaries under the instrument were related to the Grantor, i.e. nieces originally then a niece and grandnieces and grandnephews per stirpes and down the respective lines. Dr. Werle had been married twice, and in addition to the income from his own revocable Trust, which amounted to 1.7 million dollars, he was the sole beneficiary during his lifetime of two other trusts of his two other wives, one under an agreement of trust and the other under a testamentary trust each of which amounted to the same amounts as his trust, and Union Trust was Trustee. Dr. Werle had substantial sums of income from the Trusts which all was deposited in his personal checking account. Dr. Werle at all times prior to October 31, 1990 had free use and control of the assets of his trust and his wifes' trusts. On October 31, 1990 Dr. Werle's checking account was closed and all distributions under his trusts were poured into his Trust Agreement of March 26, 1980. On hand June 5, 1992 shortly after Werle's death, the principle on hand in his Revocable Trust was $1,764,184. The amount of income available to Dr. Werle from 1980 to 1992 was $1,348,166 (See Schedule D page 3). Up to the appointment of a conservator Dr. Werle had all income distributed to him. Dr. Werle was a very generous person with his friends and gave substantial sums of money to various people which prior to the application for the appointment of a conservator was never questioned. The Trust officer in this case had little contact with Dr. Werle from 1988 to 1990, probably once or twice per year. From the evidence adduced at trial and the circumstantial evidence produced this court concludes that Werle was a generous man to people he liked and was somewhat eccentric with the maintenance or his room at the convalescent home, particularly in his keeping unnecessary copies of either his work or articles he read.
Milton DeVane ("DeVane"), who specializes in estate practice, became Werle's attorney in 1987. The Trust Agreement was originally prepared by Attorney Faulkner of Wiggin and Dana in 1980.
DeVane prepared the Trust Agreement Amendment which changed the way the property in the Trust would pass upon the death of Werle. Werle wrote and called DeVane to change his testamentary trust. On one occasion when Werle thought DeVane was too slow he wrote to the Probate Judge for Cheshire. From testimony elicited from DeVane, Behrmann, or no one else, ever called to have the Amendment effectuated. DeVane arrived at the convalescent home at 9:00 A.M. o'clock March 4, 1992 with Attorney Ann Merriam, an CT Page 10099 associate of DeVane. DeVane consulted with Dr. Ruben, a psychiatrist before going to the home to execute the instrument. DeVane testified that he consulted with Dr. Ruben because of his increasing doubts of Werle's testamentary capacity. DeVane was still the conservator of the person of Werle at the time the Amendment to the Trust was executed.
When DeVane arrived at the room Heather Hartmann, a person who befriended Werle because of her interest and curiosity of people who reach the tender years of 100, was in the room. DeVane testified that he asked Hartmann to leave the room; that DeVane discussed the contents of the Amendment trying to be sure Werle understood them. DeVane and Merriam witnessed the execution of the Amendment. The meeting at the convalescent room took about one-half hour. DeVane testified that Werle was sitting up in his chair. Because of Werles difficulty hearing and poor eyesight DeVane proceeded slowly when talking with him "but he (Werle) seemed to be responding in a normal fashion, normal of course for a man who was 104 years old. He seemed to be making coherent responses". DeVane testified he wasn't sure at all that he had testamentary capacity and that is why he called Dr. Ruben.
This court concludes that DeVane an experienced attorney, aware of the potential challenges to the Amendment of the Trust was exercising reasonable professional caution by not executing self proving affidavit as to Werle's soundness of mind.
In Jackson v. Waller, 126 Conn. 294, 301
 "The fundamental test of the testatrix's capacity to make a will is her condition of mind and memory at the very time when she executed the instrument. Nichols v. Wentz, 78 Conn. 429, 435 62 A. 610; Sturdevant's Appeal, 71 Conn. 392, 401, 42 A. 70; Kimberly's Appeal, 68 Conn. 428, 439, 36 A. 847; 1 Schouler, Wills, Executors Administrators (6th Ed.) § 97. While in determining the question as to the mental capacity of a testator evidence is received of his conduct and condition prior and subsequent to the point of time when it is executed, it is so admitted solely for such light as it may afford as to his capacity at that point of time and diminishes in weight as time lengthens in each direction from that point. Canada's Appeal, 47 Conn. 450, 463; Cullum v. Colwell, 85 Conn. 459, 465, 83 A. 695."
 I
CT Page 10100
Undue Influence
The trial produced 1240 pages of conflicting testimony to support the claims of the defendants as above outlined.
 "The burden of proof where undue influence is alleged, as it was by the defendant, is on the contesting party. Berkowitz v. Berkowitz, 147 Conn. 474, 476, 162 A.2d 709 (1960); Lockwood v. Lockwood, 80 Conn. 513, 523-24, 69 A. 8
(1908). The type of confidential relationship which would shift that burden to the proponent is not present in the instant appeal. See Berkowitz v. Berkowitz, supra, 476-77; Page v. Phelps, 108 Conn. 572, 587, 143 A. 890 (1928); Dale's Appeal from Probate, 57 Conn. 127, 144, 17 A. 757 (1889)." See Stanton v. Grigley, 177 Conn. 558, 565.
The defendants, Tracadas and Zehrbach/Jones has the burden in this case to prove undue influence.
Our Supreme Court has said that "`undue influence' is the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." Reynolds v. Molitor, 184 Conn. 526, 528,440 A.2d 192 (1981); Fritz v. Mazurek, 156 Conn. 555, 559,244 A.2d 368 (1964) (both involving deeds of real estate). In the context of what constitutes undue influence sufficient to invalidate a will that court said:
 "`[T]he degree of influence necessary to be exerted over the mind of the testator to render it improper, must from some cause or by some means be such as to induce him to act contrary to his wishes, and to make a different will and disposition of his estate from what he would have done if left entirely to his own discretion and judgment. That his free agency and independence must have been overcome, and that he must, by some dominion or control exercised over his mind, have been constrained to do what was against his will, and what he was unable to refuse and too weak to resist. But that moderate and reasonable solicitation, entreaty or persuasion, though yielded to, if done intelligently and from a conviction of duty, would not vitiate a will in other respects valid." St. Leger's Appeal, 34 Conn. 434, 442, 449.'" CT Page 10101
Lee v. Horrigan, 140 Conn. 232, 237, 98 A.2d 909 (1953).
Tracadas argues that the influence of Behrmann, Hartmann and Smith or any combination of those three exerted such influence over Werle so as to execute the Amendment Trust March 4, 1992 and the codicil previously discussed. Behrmann a lab technician of St. Raphael Hospital offered a ride home to Werle who was an outpatient at the hospital when he was 94 years old. From that date to the date of death, Behrmann became Werle's friend.
Tracadas argues over a period between January 1, 1985 and October of 1990 when Werle's check book was taken by Patenaude, Union Trust officers that Werle made "payment" to Behrmann in amounts up to $332,000. Zehrbach/Jones recognizes them as gifts. DeVane testified that Werle was more knowledgeable about his affairs then the average person up to 1990.
At the direction of Werle, DeVane prepared authorization for Behrmann to gain access to Werle's safety deposit box. In 1989, by codicil, Werle willed his personal residence to Behrmann. At the time Behrmann expressed reluctance to do any work on the property because title was not in her name and she thought it might be presumptuous on her part and the family wouldn't like it. Werle also gifted his furniture of the house to Behrmann. DeVane had suggested to deed over the residence since Werle wanted Behrmann to have the house and it might be appropriate in 1989 rather than wait till he died. To gift the house to Behrmann was not her idea.
Some time in October 1990, family members came east to visit Werle. They contacted DeVane. They stayed East 3 or 4 days. The three members that came were Beatrice Zehrbach, a niece, the one-half beneficiary of the original trust, and Robert Jones and Clarice Fisher, a grandnephew and grandniece. They were suspicious of what was going on with Werle, having seen his convalescent surroundings and activities. They asked DeVane to look into Werle's affairs and what he was doing with his money. They further questioned the large sums of money passing through to other people. It was after their visit that Patenaude relieved or took away Werle's check book suggesting to Werle he needed to prepare gift tax returns.
In the spring of 1991 Dr. Robert Jones, Werle's grandnephew applied for an involuntary conservatorship. Werle called DeVane to oppose the conservatorship. DeVane informed Judge Voelker, CT Page 10102 Judge of Probate at Cheshire, that Werle would not consent and that Werle was very upset by the application.
DeVane felt it was in Werle's best interest to fight the conservatorship, and he undertook to represent Werle to oppose it.
Werle was generous not only to Behrmann but to other friends and whomever he knew that may have needed some help.
The only other person who the Tracadas's claimants assert was in a position to exert influence was Heather Hartmann who from all the evidence adduced concerning her participation, this court can only conclude that even though one might consider her as a meddler, was trying to assist Werle to cut his relatives out of his estate and substitute others.
Tracadas and Behrmann/Jones have failed to meet their burden of proof on the issue of undue influence. They have failed to show that any person induced or pressured Werle to act contrary to his wishes and to make a different disposition of his property from what he would have done if left to his own free agency and independence or that someone exercised dominion and control over Werle's mind to do what he did not want to do.
 II Testamentary Capacity
 "The burden of proof in disputes over testamentary capacity is on the party claiming under the will. Pastir v. Bielski, 174 Conn. 193, 194, 384 A.2d 367 (1978); Wheat v. Wheat, 156 Conn. 575, 578, 244 A.2d 359 (1968); Comstock v. Hadlyme, 8 Conn. 254, 260-61 (1830). While there is a presumption of sanity in the performance of legal acts, the party that presents a will still bears the burden of going forward with his proof, and only then does the burden shift to the opponents to prove incapacity. Wheeler v. Rockett, 91 Conn. 388, 392, 100 A. 13 (1917); Sturdevant's Appeal from Probate, 71 Conn. 392, 399-400, 42 A. 70 (1899); Knox's Appeal from Probate, 26 Conn. 20, 21 (1857). Stanton supra at p. 564
In this case the capacity questioned is that of making a valid inter vivos transfer of one's property (Amendment to Trust, CT Page 10103 March 4, 1990) and his codicils C6 and C7. One who doesn't have testamentary capacity cannot make a valid gift or execute a valid will. In this case by order of the court each claimant was called upon to assert their claims and each party raised the issue of testamentary capacity. Consequently in this case the Tracadas and Zehrbach/Jones, as well as Behrmann/Smith, had the burden of proof to show that the Amendment Trust of 1990 and the codicils are invalid. All parties presented evidence on that issue.
Zehrbach/Jones and Tracadas presented the challenge to Werle's testamentary capacity with the testimony of two doctors as well as all other circumstantial evidence through other witnesses.
After the visit by the Werle's relatives in October 1990 the trustee Patenaude and Werle's attorney began to scrutinize more what Werle was doing with his estate distributions. Werle was receiving income from 3 sources, each of which was in excess of 1.5 million dollars as earlier discussed.
All distributions were placed in Werle's personal checking account also held at Union Trust.
Dr. James Ciarcia ("Ciarcia") conducted a psychiatric examination of Werle May 3, 1991. Ciarcia was contacted by Attorney Vincent Amendola to conduct the examination. Behrmann had contacted Amendola because Werle was upset over a second written request by DeVane to return the jewelry she had removed from the safety deposit box in June 1990. The DeVane request was made three weeks after Werle's relatives visit in October 1990 and more shall three months after she was given the jewelry. Dr. Werle had suggested she contact a lawyer. Amendola was suggested by a fellow worker at the hospital. Amendola spoke to Werle. Behrmann never spoke to Amendola about retaining a psychiatrist and Dr. Ciarcia stated he had a call from Amendola to conduct "a mental status exam and determine diagnosis and competency at the time". Amendola represented himself as having a "fiduciary responsibility over Mr. Werle's estate".
On June 5, 1991 Judge Voelker, who testified, received an Involuntary application for the appointment of a conservator. The petition was signed by Zehrbach and Robert W. Jones. On July 3, 1991 the hearing date set for the Involuntary application, Attorney Marshall D. Gibson appeared representing Zehrbach/Jones; Patenaude for the Trustee; DeVane representing Werle and another CT Page 10104 attorney, Bucar, colleague of DeVane. The application was strenuously contested by Werle. After some testimony the matter was continued, and Patenaude stated he would approach Werle as to his willingness to sign a voluntary application. Thereafter if there was no agreement between the parties, Attorneys Gibson and DeVane would agree to a medical examination by a physician other than his attending physician at the convalescent home.
The involuntary petition was resolved in 1991 by Werle signing a voluntary petition for the appointment of a conservator on September 11, 1991 at the convalescent home with Patenaude, DeVane and Gibson present. Judge Voelker was required to visit the petitioner to determine if Werle understood the basic nature of the role of conservator of the estate and conservator of the person. Judge Voelker testified that Werle after he had explained the functions of the conservators understood them fully of he would not have issued the orders.
Dr. Jack Halickman examined Werle at the request of Attorney Gibson for Zehrbach/Jones on April 14, 1991 for the issue of competency relative to the conservator proceedings. Dr. Halickman reviewed the medical records of Werle, spoke to nurses on the floor, asked Werle questions to which he responded appropriately. He found Werle oriented and able to form decisions as to his care and general welfare. He found Werle cooperative and very friendly, alert and not agitated. He found his long term memory adequate and short term memory rather weak.
Dr. Halickman did not do cognitive testing. Dr. Halickman did not assess whether Werle could manage his personal affairs. Attorney Gibson stated that Halickman's report was not helpful to their position for the conservatorship so he sealed it and mailed it to the Probate Court under letter of April 16, 1991. Attorney Gibson advised Zehrbach/Jones, his clients, that Dr. Halickman's report would not help them because the doctor had concluded he was competent.
Dr. Ciarci made a diagnosis that Werle had inability to understand and have insight as to everything. Dr. Werle was seriously hard of hearing and Ciarci had to repeat and speak loudly. Dr. Werle related in his examination that he worked on Wall Street. Ciarci was aware that Werle wanted to change his Will. Dr. Werle also had bad eyesight. Dr. Ciarci conducted a Folstein Test and Werle fell into the moderate range of dementia. Folstein Tests measure degrees of dementia from mild to severe. CT Page 10105 There are factors at the time of the testing that could vary the results Ciarci recognized that Werle was alert and had no delirium. Werle did not have total lack of recall. Werle revealed he was a former professor of Economics and History. Werle told Ciarci he had no medical problems. Werle had sensed he was perfectly fine. When asked by Ciarci, Werle said Amendola was his lawyer. When asked about his relatives Werle responded by stating they lived on the West Coast and that he didn't like Zehrbach and Jones and never sees them. All later testimony and finding of other experts in this case lends little probative value to Dr. Ciarci's finding as to the testamentary capacity of Dr. Werle at the time he executed the Amendment Trust and codicils. Dr. Ciarci's evaluation was further flawed because from all the evidence, and contrary to Dr. Ciarci's findings, Werle did have knowledge of this financial affairs.
The court now turns to the evidence surrounding the execution of the document on March 4, 1992. From all the evidence adduced at trial the court can only conclude that Werle adamantly wanted to change his trust and the way his money would be distributed. DeVane prepared the Amendment Trust and the codicil which he brought with him to the convalescent home on March 4, 1992. DeVane was accompanied by Attorney Ann Merriam a lawyer in his firm. Both Merriam and DeVane acted as witnesses to the Amendment to Trust Agreement and codicil (Exhibit C7). Merriam testified she had never met Werle before or after March 4, 1992. She testified Werle recognized DeVane. DeVane took the acknowledgement of Werle. There were two people in the room when Merriam and DeVane arrived. DeVane asked them to leave the room. DeVane spoke loudly and slowly. DeVane discussed the changes Werle wanted and also read the codicil to him. DeVane asked Werle if this is what he wanted him to do and Werle said yes. Merriam's impression was that Werle understood the changes and wanted to make the changes.
In 1988 DeVane, shortly after becoming Werle's lawyer prepared a codicil in 1988 in which he made bequests to Behrmann and others not heirs of Werle. On April 12, 1991 DeVane did the codicil wherein Werle bequeathed books and pamphlets in which he also made bequests to Behrmann of $50,000 and $5,000 to Margy Barrett of Vermont. When relatives came to visit Werle, DeVane had discussions with them. Werle's family suggested that Werle was incompetent. After the family came in 1990 Werle did not receive regular statements previously sent to him from Union Trust. Up to that time Werle received his reports and was CT Page 10106 interested in his financial affairs. Between April 1991 and the beginning of 1992 DeVane received calls and messages from Werle in his handwriting that Werle wanted to change his trust and he wanted to remove his family. Werle specifically at one time wanted Dr. Jones out of his estate. Werle at one time sent one of his notes to Judge Voelker (See Exhibits 48 and 49 Behrmann). In early February 1992 DeVane went to see Werle. He and Werle spoke about his estate and Werle essentially told him what went into the documents executed on March 4, 1992. Werle wanted his family out and he was very emphatic about it. Although Werle at first was not certain who he wanted to benefit from his estate he was emphatic and sure he did not want his family members. In (Exhibit 14 Behrmann) Werle again directed DeVane in his own writing what he wanted done with his estate, specifically directing DeVane "to take his family name off my trust accounts" and "to leave my trust accounts to my friend Helen Smith and Elizabeth Behrmann."
DeVane discussed with him the changes made on March 4, 1992. DeVane testified it was clear when Werle executed the instrument, the Amendment to Trust and codicil on March 4, 1992, that it was what Werle wanted.
Werle recognized and said hello to DeVane when he arrived that morning and DeVane was surprised that Dr. Ruben said when he spoke to him that Werle did not know DeVane one-half hour after he had been there. DeVane testified that Werle was very upset with his family because Werle felt they were meddling in his affairs and Werle wanted them out of his estate. DeVane drew the instruments and had Werle execute them so Werle could be at peace with himself knowing the document would be changed.
Werle had control of his checking account and use of his money before family arrived which caused a disruption to his life which he had managed well for 103 years. This court does not find it surprising from all the evidence that he wanted to name others to benefit from his estate than his family.
Dr. Ruben who examined Werle at 10:00 A.M. o'clock, about one-half hour after the execution of the documents concluded that in his opinion Werle was not competent. Behrmann agrees that "ordinarily, the testimony of a psychiatrist at a time close in proximity to the time when a will is executed would certainly be important testimony relative to the issue of testamentary capacity" but that in this case, however Dr. Rueben testimony is totally flawed in a number of respects. After only 45 minutes to an hour of an CT Page 10107 examination, Dr. Ruben made such a conclusion. Dr. Ruben, who knew he was there for the purpose of determining the testamentary capacity of Dr. Werle, knew nothing of Dr. Werle's background or the reasons Dr. Werle had made the changes. Dr. Ruben did not speak to anyone other than to refer to a prior medical note back in 1990, by Dr. Nestler who found some mild dementia but that Werle was doing well. Dr. Ruben administered the Folstein Test which disclosed that Werle was moderate dementia; however, such a diagnosis is not conclusive as to testamentary capacity but only to be considered in the overall picture. Dr. Ruben was not aware of Werle's difficulty hearing and seeing when all other witnesses testified that all communications had to be made extremely close to Werle. Dr. Ruben further testified that his diagnosis was made principally on his clinical findings all of which are contrary to what DeVane and Merriam testified at the time of execution.
Heather Hartmann awakened Werle for his examination by Dr. Ruben who asked her to leave her room. Dr. Ruben stated that Werle was not sure he had a Will or what was in the Will. However, when asked about his marriages, Werle stated he was married twice although not sure of second wire's name. Werle related he had younger brothers and older sister but they all died. Werle stated emphatically that he had no living relatives. Such reaction is not unnatural from all the evidence produced as to his desire to cut out his relatives and how Werle personally felt about them. Werle said his nurse was Helen Smith.
When Werle was asked if Patenaude had power of attorney he said he thought so. Werle when asked about Jones, Zehrbach, Paul and Clarice Fisher said they were strangers. However, when asked again about his relatives, Werle stated "Robert Jones was a crook," a long time feeling that Werle harbored after the conservatorship application and his feelings that his family were meddling in his affairs. Werle also knew when questioned about a letter that Werle had asked to assign his Trust to Behrmann and Smith, stated "Smith was a nurse and Behrmann was a friend."
When Dr. Ruben was questioned about testamentary capacity he stated it was one's ability to make a Will; the standards for testamentary capacity are that a person have knowledge of one's estate and who he would consider objects of his bounty. In this case the court concludes that the objects of Werle's bounty were Behrmann and Smith not his relatives. Dr. Ruben further based his opinion upon Werle's failure to respond as to the amount of his estate. It is not unusual for a person such as Werle to either CT Page 10108 not disclose such information or because of its size being cautious.
A more reliable evaluation of Dr. Werle's testamentary capacity in this case would have been just prior to the execution of the documents on March 4, 1992.
Our Supreme Court has stated "that it is the precise moment that is important. Jackson v. Waller, 126 Conn. 294, 30210 A.2d 763.
Dr. Werle died March 30, 1992, 26 days after he executed the Amendment Trust and Codicil (Exhibit C7).
Under all the facts adduced at trial this court concludes that Dr. Werle had the requisite testamentary capacity to execute the Amendment to Trust and codicil on March 4, 1992.
Accordingly, judgment may enter in favor of the claimants Behrmann and Smith.
The court retains jurisdiction to decide the claims and issues regarding attorney's fees and costs.
Frank S. Meadow State Trial Referee CT Page 10109