[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFFS' APPLICATION FOR TEMPORARY INJUNCTION
The plaintiffs have filed this application in conjunction with their complaint, amended during the hearing on the application, seeking to enjoin the defendant from transferring or distributing the real property in this estate. It is their claim that the North Haven Probate Court improperly admitted the will of the decedent, father of the plaintiffs. The purpose of the application is to restrain any disposition of the real property, pending the plaintiffs' appeal from probate.
The plaintiffs have the burden of establishing to a reasonable certainty that they will prevail on the permanent injunction or underlying cause of action. (Citations omitted.) In the amended complaint, the plaintiffs allege that on the date of the execution of the will, and for some time prior thereto, the decedent was not of sound mind and memory and lacked testamentary capacity. The plaintiffs go on to claim the decedent had been ill, suffered from depression and lacked sound mind and memory, leaving him unable to understand his business as well as the will in question. He is also described as delusional and allegedly executed the document in question while under the influence, domination and control of the named defendant, his niece Maria Krawiec, his attorney who prepared the will, and other family members. Finally, the complaint states the will in question was revoked by the decedent.
 I.
The will in question was executed on October 2, 1987, after an office interview with the testator's attorney on September 29, CT Page 11760 1987. Simultaneously, the testator instituted a dissolution action against his wife. This is the crucial period of time for the allegations of legal incapacity.
Of the six witnesses for the plaintiff, and of the three called by the defendant, only one witness for each side can be considered as neutral or disinterested.
Mr. Robert Goddard, a tenant of the decedent, testified for the plaintiff and stated he had known the decedent since 1990. Though this was about three years after the will execution, Mr. Goddard described the decedent as a nice person who could be friendly. His memory was good. The decedent could get angry and had mood swings; this was more dramatic "in the last six months." In the first part of this year, he stated, the decedent's memory was not what it used to be. He also stated that he took his rent check to the decedent who frequently gave him vegetables from his farm.
Ms. Eleanor Andrews was called by the defendant with respect to a conversation she had with the decedent shortly before his death. She related a fourteen-year acquaintance with the decedent who, after a stormy beginning, got in the habit of dropping in and chatting with her at her office in the North Haven Town Hall. Nothing in her testimony suggests she was chatting with an impaired person and in fact her recitation of things the decedent said would indicate the contrary.
The plaintiffs placed in evidence Exhibit G, a notebook the decedent apparently utilized as a diary, though it is obvious that pages have been removed. A page dated in 1984 and 1985 is in Polish and depicts a neat and legible handwriting. No translation was provided for this page.
Another page is headed "My bills for 1984 up to 1987." It is a dated, neat and legible statement of expenses, repairs and explanations. Columns of figures are clear and legible and the addition is correct.
The first three pages are in the handwriting of the decedent, with several lines on the third page erased. From the contents, it appears to have been written by the decedent at a time when the dissolution action was pending. There is a statement of his relationship with his wife, his moving to Concord Street, and details of his mother's death, funeral arrangements and the cost CT Page 11761 of the funeral. These pages reflect a version of the events leading up to his removal to Concord Street and the dissolution action substantially different from that related by the plaintiffs who testified.
A page detached from the notebook, and obviously lacking the page preceding it, is a detailed recitation of events that occurred in 1985, 1986 and 1987. This was dictated to Maria Krawiec by the decedent.
The Court will refer to this exhibit in connection with other issues addressed, but there is nothing in this Exhibit G to suggest this decedent was of unsound mind and memory at the time it was prepared. In fact, it is strong evidence of the contrary. It should be noted that in offering this exhibit, plaintiffs' counsel, in answer to the Court's question, stated it was his position the diary dated from 1987.
Though the plaintiffs have made accusations against him that question his objectivity, the Court must consider the testimony of Attorney Joseph DePaola, who represented the decedent in the dissolution action, drew the will in question, and attended to its execution.
Mr. DePaola had represented the decedent since 1985 or 1986. He described him as of sound mind, strong will, simple and straightforward. He knew what he wanted to do and took an active role in the dissolution action. It is significant that Mr. DePaola questioned the decedent as to his omitting his children from the will and after the dissolution on May 6, 1988, wrote to the decedent and reminded him of what he had done and asked that he call Mr. DePaola if he wished to make any changes. This casts serious doubt on the plaintiffs' claim that this attorney was somehow trying to acquire the property of the decedent.
The Court has examined its notes taken of the testimony of the plaintiffs and their witness Mr. Ghiroli, has had the court reporter read back portions of the testimony and has ordered portions of the same. There is virtually nothing which can be construed as evidence that this decedent was of unsound mind when he executed the will. In fact, much of this testimony supports the defense contention, for the plaintiffs have presented testimony that asks this Court to believe that the decedent was of unsound mind in and before 1987, but at later times when he supposedly said things favorable to them, he was not. CT Page 11762
Mr. Ghiroli's testimony is a case in point. He stated he had a good relationship with the decedent, that he worked with him a lot and that he told Ghiroli that the property passing under the will to Ms. Krawiec and the defendant was "all one and should be kept in the family." But, Mr. Ghiroli says, the decedent, in 1987, didn't appear to understand what he was doing while going through the divorce. He also said that the decedent was always able to function day-by-day but knew nothing of legal matters.
Philip Brudz, a plaintiff, stated he too had a good relationship with his father, the decedent. In fact, they were in business together until some disagreement occurred in 1986 or 1987. They reconciled in 1990 or 1991. Mr. Brudz filed partnership tax returns on the business into the 1980s. He cited no time or no episode in which the decedent displayed an unsound mind and the Court seriously doubts he was in business with and filed tax returns with an incompetent partner.
Peter Brudz said nothing to suggest his father was of unsound mind at any time, and nothing in the testimony of the decedent's daughter, Judith Ghiroli, supports such a claim.
Both the defendants Mary Gasorek and Marcia Krawiec testified that the decedent was of sound mind and enjoyed a normal mental state. They cite various activities reading, writing, driving a car, visits and conversations with friends and relatives, farming, planting, selling vegetables and maintaining the premises at Concord Street and Mill Road. At one point, he had the real property appraised for the purpose of selling it. He read the newspaper daily and helped Maria prepare for colleges tests by reading questions to her.
The burden of proof in disputes over testamentary capacity is on the party claiming under the will. Stanton v. Grigley,177 Conn. 558, 564 (1979), citations omitted.
The Court concludes that the defendant has proven the capacity of the decedent, and the Court so finds. Therefore, the plaintiffs are not likely to be successful on this issue in the underlying cause of action.
 II.
The Court next addresses the plaintiffs' allegation of undue CT Page 11763 influence. Again, the collected testimony of the plaintiffs' witnesses is totally lacking in support for this premise while strongly supporting the contrary.
The burden of proof where undue influence is alleged is on the contesting party. Stanton v. Grigley, supra, at 565.
The Court is mindful of the law pertaining to undue influence. A contestant will usually have to rely on circumstantial evidence and undue influence is generally proved by a combination of facts, each of which standing alone may have little weight but taken collectively may establish its existence. Causes of Action, Vol. 6, Section 31, cited 6 COA 91, 165 (1985 ed).
Mr. Goddard described the decedent as "No one you could push around" and one who "made up his own mind". He negotiated with the decedent over the purchase of the property now the subject of these proceedings. Mr. Goddard noted the decedent had "mood swings", especially in the last six months.
The plaintiffs point to one episode in support of their position. In 1986 when the decedent was hospitalized, one "Yonka", a relative, is reported to have "pushed" him, via yelling and screaming, to make a will leaving the property to Maria Krawiec. Neither Maria nor the defendant were there. The hospitalization occurred in February of 1986 (Exhibit G) and the will was executed on October 2, 1987. There is no evidence of any other activity by Yonka or anyone else directed toward the decedent. Nor did anyone describe the decedent's reaction to this "pushing".
Yonka appears in another episode, this related by Judith Ghiroli, the decedent's daughter. In a conversation with Maria (which Maria denies having), Maria is purported to have told Judith that Yonka told her (Maria) to remain here in the United States because she could get "all my father's property. . . ."
While it is true that Maria Krawiec lived in the same household as the decedent and for a time lived in an apartment in his house, the plaintiffs offered no evidence of undue influence on her part, other than that she had the opportunity to exert the same. As for Attorney DePaola and Mary Gasorek, there was no evidence of activity on the part of either of them to even suggest they were guilty of undue influence. CT Page 11764
Mr. DePaola's testimony, which the Court finds credible, is consistent with that of Mr. Goddard, i.e., that this decedent was strong willed and knew what he wanted to do.
Where there is no direct evidence of influence a factual foundation supportive of a reasonable inference that, but for the plaintiffs' actions, the testator would have made a different disposition, is sufficient to sustain a finding of undue influence. Stanton v. Grigley, supra, at 565. No such inference can be drawn here. See also Lee v. Horrigan, 140 Conn. 232,237-238 (1953), for the test to apply.
The Court concludes that the plaintiffs are unlikely to prevail on their undue influence claim. They have not proved it in this proceeding.
 III.
The plaintiffs further allege that the decedent revoked the will in question. There is no evidence that he did anything to accomplish this or that he told Mr. DePaola to destroy it. Though there is evidence that he caused a subsequent will to be prepared, it apparently was not executed and was not offered in evidence.
The plaintiffs rely on statements allegedly made to them by the decedent to the effect that the sons would get the land and a statement made to Mr. Goddard that he would not sell the property to him because the boys wanted it.
These statements are susceptible to many logical interpretations inconsistent with a will revocation having occurred. The obvious one is that this was an easy way for the decedent to avoid discussion and unpleasantness. For Mr. Goddard, it may have been a way to abort negotiations and avoid hurt feelings.
The Court finds the plaintiffs failed to prove an effective revocation of the will.
 IV.
The plaintiffs also alleged the will was the product of the testator's delusions. No evidence of delusional thinking was introduced, rather it appears the plaintiffs were suggesting that CT Page 11765 the testator may have disinherited them under mistaken notions — delusions, if you will, that they sided with their mother in the dissolution action and that they neglected him;
There was testimony both ways as to how much attention the plaintiffs paid to the testator, but the plaintiffs produced Exhibit G which stated the testator's frame of mind and his perceptions. These were all supported by the defendant, Maria Krawiec, and Mr DePaola. Even Mr. Goddard stated he didn't know the testator's sons until after his death and on his visits to the farm, the only person he saw there, except for the testator, was Maria.
The Court found it significant that the decedent's ex-wife was not called as a witness, though she lives on a portion of what had been the family holding prior to the dissolution. It is also exceptional that the plaintiffs were unable to introduce Exhibit G into evidence until Maria identified the handwriting in the diary as that of the decedent.
There was a total failure of proof on this allegation.
Conclusion
It having been determined that the plaintiffs are not likely to succeed in proving their case, the plaintiffs' application for a temporary injunction is denied.
Anthony, V. DeMayo State Trial Referee